# In the United States Court of Federal Claims

Nos. 20-1108C and 20-1290C

(Filed:  November 30, 2020)

| | |
|---|---|
| **THE TOLLIVER GROUP, INC.,** | Solicitation cancellation; Small Business Act; Rule of Two; set-aside; withdrawal; Federal Supply Schedule (FSS); multiple award contract; IDIQ; *RAMCOR*; *SRA Int'l*; Federal Acquisition Streamlining Act (FASA); Administrative Dispute Resolution Act of 1996 (ADRA); Competition in Contracting Act (CICA); GAO protest jurisdiction; Tucker Act jurisdiction; FAR Part 8; FAR Part 14; FAR Part 15; FAR Part 19. |
| **and** | |
| **PEOPLE, TECHNOLOGY AND PROCESSES, LLC,** | |
| *Plaintiffs,* | |
| **v.** | |
| **THE UNITED STATES,** | |
| *Defendant.* | |

*Jon D. Levin*, Maynard, Cooper & Gale, PC, Huntsville, AL, for Plaintiff, The Tolliver Group, Inc.  With him on the briefs were *W. Brad English, Emily J. Chancey*, and *Michael W. Rich*.

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Plaintiff, People, Technology and Processes, LLC.  With him on the briefs was *Nathaniel E. Castellano*.

*David R. Pehlke*, United States Department of Justice, Civil Division, Washington, DC, for Defendant.  With him on the briefs were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, Civil Division, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC.

## OPINION AND ORDER

*SOLOMSON*, **Judge.**

This case presents the question of whether, or under what circumstances, an agency – in this case, the Department of the Army ("Army" or the "agency") – may cancel a Federal Acquisition Regulation ("FAR") Part 8 procurement for the express purpose of moving it from a service disabled veteran-owned small businesses ("SDVOSB") set-aside under a General Service Administration ("GSA") Federal Supply Schedule ("FSS") to a multiple award indefinite quantity indefinite delivery

1

("MAIDIQ") vehicle, a contract that the Plaintiffs in this case do not hold.  Additionally, the Court must address the source, if any, of this Court's jurisdiction to decide complaints challenging an agency's cancellation of a FAR Part 8 procurement.

Plaintiffs, The Tolliver Group, Inc. ("TTGI" or "Tolliver"), and People, Technology and Processes, LLC ("PTP"), claim that the agency's decision to cancel two GSA FSS support staffing solicitations fails the Administrative Procedure Act ("APA") standard of review applicable in actions brought pursuant to 28 U.S.C. § 1491(b)(1), which requires that an agency action must not be arbitrary, capricious, or otherwise contrary to law.  Plaintiffs allege the agency's cancellation decisions fail the APA standard of review based on the extreme brevity of the analysis underlying the agency's decision and, in Plaintiff's view, the agency's *ipse dixit* conclusions.  More significantly, Plaintiffs assert that the agency's decision and supporting rationale – namely, to move the solicitations at issue to a recently awarded MAIDIQ – violates FAR 19.502-2(b), commonly known as the "Rule of Two."  Plaintiffs seek permanent injunctive relief, including an order preventing the Army from cancelling the set-aside solicitations and resoliciting the work under the MAIDIQ until the agency complies with the Rule of Two and other relevant regulations.

Defendant, the United States, counters that the agency acted reasonably under the APA review standard, or, in the alternative, because the agency's power to cancel a FAR Part 8 solicitation is virtually plenary, the decision should be reviewed only for "bad faith," which, the government claims is unsupported based on the record.  The government further contends that Plaintiffs' Rule of Two claim is foreclosed by the Federal Acquisition Streamlining Act ("FASA") task order protest bar and, that on the merits, an agency is not required to perform a Rule of Two analysis before soliciting work under an existing MAIDIQ.

For the reasons explained below, the Court holds: (1) in the context of the facts of this case, this Court has jurisdiction based upon an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); (2) the FASA task order bar does not pose a jurisdictional hurdle to Plaintiffs' respective causes of action, including the Rule of Two arguments; and (3) pursuant to the APA review standard, which applies here, the agency's decision is inadequate, both in terms of the dearth of its analysis and because the agency has not complied with the FAR's Rule of Two and other provisions of law.  Consequently, the Court holds that Plaintiffs are entitled to the equitable relief that they seek.

## I.    Factual and Procedural Background[1]

TTGI and PTP are both Florida-based SDVOSBs which provide, among other things, staffing and technical support services.  ECF 21 ("TTGI Am. Compl.") at ¶ 5; *People, Technology and Processes, LLC, v. United States*, Fed. Cl. No. 20-1290, ECF No. 1 ("PTP Compl.") at ¶¶ 15–17.  The Army maintains the Fires Center of Excellence ("FCoE"),[2] a field artillery school located at Fort Sill, Oklahoma, that "trains soldiers, officers, and marines in tactics, techniques, and procedures for the use of fire support systems in combat."  PTP Compl. at ¶ 16.  From 2010 until 2016, the Army had utilized a long-term omnibus multiple award IDIQ ("OMNIBUS MAIDIQ") contract to procure training and instructor services at Fort Sill.  ECF No. 25 ("Administrative Record" or "AR") at 617–20 (AR 613–16).[3]  Following the expiration of those contracts, the Army utilized a series of short-term contracts to procure those services.  *Id.* at 617 (AR 613). This case arises out of the Army's issuance of two solicitations in early 2020 — the 13F and Joint Fires Observer Course ("JFOC") Solicitations — for procuring training instructors for fire support specialists at Fort Sill, awarding contracts pursuant to those solicitations, and subsequently cancelling both the contracts and the solicitations, the latter for the purpose of transferring their scopes of work to an existing MAIDIQ.  This section summarizes this matter's factual background and procedural history.

### A.   The 13F And JFOC Solicitations And Award Of The Contracts

On April 3, 2020, the Army's Mission and Installation Contracting Command ("MICC")[4] at Fort Sill issued Solicitation No. W9124L-20-R-0016 (the "13F Solicitation") pursuant to the GSA Multiple Award Schedule ("MAS")[5] as a 100% SDVOSB set-aside using primarily the procedures outlined in FAR 8.4 and incorporating certain FAR Part 15 provisions.  ECF No. 25 at 5–7, 346 (AR 1–3, 342).  Specifically, the 13F Solicitation sought to procure "20 fully qualified personnel to instruct 13F [Advanced Individual

---

[1] *See, infra,* Section III.A.

[2] *See* Fort Sill Fire Center of Excellence, *Fort Sill Values*, https://sill-www.army.mil/index.html (last visited Nov. 11, 2020).

[3] Throughout this opinion, the dual citations to the Administrative Record account for discrepancy between the page number indicated in the Court's CM/ECF stamp on the PDF document and the AR page cite.

[4] The MICC "provides contracting support for Soldiers across Army commands, installation and activities" and is "responsible for contracting goods and services in support of Soldiers as well as readying trained contracting units for the operating force and contingency environment when called upon."  *See* https://www.army.mil/micc#org-locations (last visited Nov. 15, 2020).

[5] GSA Schedules are referred to as a Multiple Award Schedules ("MAS") and Federal Supply Schedules ("FSS").  *See* https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules (last visited Nov. 25, 2020); *see also* FAR Part 8.

Training] courses" regarding "[p]lanning and coordinating fire support for the maneuver commander, locate and engage targets utilizing calls for indirect fire to mortars, field artillery and naval surface fire support assets and battlefield information reporting." *Id.* at 40, 44, 83 (AR 36, 40, 79). This solicitation contemplated the award of a contract with a "twelve (12) month base period [of performance] to include a 90 day [sic] phase-in period, followed by one (1), one-year option period." *Id.* at 40 (AR 36).

On April 6, 2020, the MICC separately issued Solicitation No. W9124L-20-R-0020 (the "JFOC Solicitation"), pursuant to the GSA MAS, also as a 100% SDVOSB set-aside. *Id.* at 386–88 (AR  382–384). Specifically, the JFOC Solicitation sought to procure "14 qualified personnel" to provide "JFOC instruction to multi-service and coalition students attending Field Artillery Basic Officer Leader Course." *Id.* at 428–29 (AR 424–25). This solicitation contemplated the award of a contract with a "twelve (12) month base period [of performance] to include a 90 day [sic] phase-in period, followed by one (1), one-year option period." *Id.* at 428 (AR 424).

In sum, both the 13F and JFOC Solicitations contemplated relatively short-term contracts that the agency designated as 100% SDVOSB set-asides.[6] Several eligible small businesses submitted timely proposals under both solicitations, including TTGI and PTP, the latter which was the incumbent provider of these services at Fort Sill. TTGI Am. Compl. at ¶ 14; PTP Compl. at ¶¶ 26, 34. On April 30, 2020, the agency awarded the 13F contract to TTGI. TTGI Am. Compl. at ¶ 16; ECF No. 25 at 244–49 (AR 240–45). On May 18, 2020, the agency awarded the JFOC contract to Navigation Development Group, Inc. ("NDGI"), another SDVOSB. *Id.* at 565, 576 (AR 561, 572).

### B.   Bid Protests And Corrective Actions

#### 1.      PTP's 13F GAO Protest[7]

On July 17, 2020, PTP filed a post-award bid protest with GAO, challenging the

---

[6] The Veterans Benefit Act of 2003 ("the Act"), amending the Small Business Act, created the SDVOSB program to facilitate the participation of service-disabled veteran-owned small businesses in federal contracting. Pub. L No. 108-183, 117 Stat. 2651. The Act contemplates the use of "set asides," which permits federal agencies to limit certain procurements for exclusive competition among SDVOSBs. *See* 15 U.S.C. § 657f. This program is implemented via FAR provisions and Small Business Administration ("SBA") regulations. *See* FAR 6.206, 19.1401–19.1408; 13 C.F.R. §§ 125.11–125.33.

[7] On May 8, 2020, PTP filed its first post-award protest before GAO, alleging that the agency did not reasonably evaluate its price proposal and that certain provisions in the 13F Solicitation were ambiguous. *See* ECF No. 25 at 327, 343 (AR 323, 339). The Army took corrective action on May 21, 2020 and, after re-evaluating the relevant proposals, on July 9, 2020, once again, awarded the task order to TTGI. *Id.* at 342–57 (AR 338–53). For purposes of the pending motions, however, the particulars of PTP's first GAO protest is not relevant.

4

agency's award of the 13F contract to TTGI.  ECF No. 25 at 358–81 (AR 354–77).  PTP alleged, among other things, that the method the agency employed to evaluate PTP's professional compensation, in comparison to that of TTGI, was improper and that, in awarding the task order to TTGI, the agency had "departed from the Solicitation's required evaluation process, held PTP and Tolliver to unequal standards, and conducted a[] flawed price realism evaluation."  *Id.* at 359 (AR 355).

On July 29, 2020, Contracting Officer ("CO") Pauline K. Abraham issued a Notice of Corrective Action.  *Id.* at 382 (AR 378).  CO Abraham acknowledged that "[t]he Army believes that taking corrective action would better serve the procurement process" and identified the measures that the agency would take, as follows:

> a.  Cancel the task order award to The Tolliver Group, Inc.
>
> b.  Re-evaluate the requirement and acquisition strategy to ensure that it accurately reflects the Army's current need.
>
> c.  Once the reevaluation is complete, the solicitation will *either be cancelled or amended*.
>
> d.  If the solicitation is amended, the Army will evaluate revised proposals, conduct discussions if necessary, and make a new award decision.

*Id.* (emphasis added).  While the Notice of Corrective Action did not elaborate on what considerations the agency would weigh as part of its re-evaluation, CO Abraham, in an internal agency memorandum (dated July 29, 2020), further explained that the rationale behind the agency's "reevaluat[ing] its acquisition strategy" was that "[o]n 21 July 2020, MICC-Fort Eustis awarded the Training Management Support ('TMS') Multiple Award Indefinite Delivery Indefinite Quantity contract, which *may* provide a *potentially* better procurement vehicle for this requirement than the [current GSA MAS]."  *Id.* at 383 (AR 379) (emphasis added).  Following the Army's July 29, 2020 Notice of Corrective Action, the GAO dismissed PTP's bid protest "as academic."  *Id.* at 385 (AR 381).

### 2.    PTP's JFOC GAO Protest

A similar situation unfolded with the JFOC contract.  On May 28, 2020, PTP filed a post-award bid protest before the GAO, challenging the agency's award of the JFOC contract to NDGI.  ECF No. 25 at 581 (AR 577).  PTP alleged that the agency's price evaluation did not comply with the solicitation, that the agency had conducted an improper best value decision, and that the agency had evaluated PTP's past performance in an unreasonable manner.  *Id.* at 582–602 (AR 578–98).

On July 29, 2020, CO Lisa Slagle[8] issued a Notice of Corrective Action that was similar to the one CO Abraham had issued in response to PTP's 13F bid protest. *Id.* at 612 (AR 608). CO Slagle's Notice of Corrective Action outlined the same steps that the agency intended to take in response to the JFOC bid protest as the agency did for the 13F bid protest: cancel the contract award, re-evaluate the Army's needs, and either amend the solicitation or cancel it. *Id.* CO Slagle also authored an internal agency memorandum (dated July 29, 2020), which similarly explained that the agency's re-evaluation of its acquisition strategy was based on the availability of the recently awarded TMS MAIDIQ. *Id.* at 613–14 (AR 609–10). The GAO also dismissed PTP's bid protest of the JFOC award as "academic." *Id.* at 615–16 (AR 611–12).

### C.   The TMS MAIDIQ

As noted above, the Army previously had procured training and instructor services using the OMNIBUS MAIDIQ, which expired in 2016, thus necessitating the use of the GSA MAS contracts. ECF No. 25 at 617–20 (AR 613–16). On October 31, 2017, the Army approved the creation of a new contractual vehicle – the TMS MAIDIQ – for the purpose of procuring these services. *Id.* at 618 (AR 614). While the Army initially intended the TMS MAIDIQ to be a small business set-aside, the Army determined, after conducting market research, that – given the breadth of the MAIDIQ's anticipated scope of work – none of the small business proposals could meet the requirements; the set-aside plan for the TMS MAIDIQ thus was abandoned in coordination with the SBA. *Id.* at 618, 1194–1212 (AR 614, 1190–1208). On September 13, 2018, the Army issued the TMS MAIDIQ Solicitation as a full and open competition. *Id.* at 618, 1207 (AR 614, 1203). After numerous delays in the evaluation process, the agency, on July 21, 2020, awarded TMS MAIDIQ contracts to five companies, all of which were large businesses. *Id.*; ECF No. 21 at ¶ 26. Plaintiffs in this case do not hold a TMS MAIDIQ contract.

### D.   The Army's Cancellation Of The 13F And JFOC Contracts

On August 10, 2020, CO Abraham – presumably as part of the agency's correction action processes – authored an internal agency Memorandum For Record (the "August 10 MFR"), "[t]he purpose" of which was "to capture the background for the recently award Training Management Support (TMS) Multiple Award Indefinite Delivery Indefinite Quantity Contract awarded by MICC-Fort Eustis." ECF No. 25 at 617 (AR 613); *see generally* ECF No. 25 at 617–20 (AR 613–16). In her four-page memorandum, CO Abraham detailed the history of the 13F and JFOC Solicitations, as well as the TMS MAIDIQ, and in the last paragraph concluded:

> Based upon the above information, *I believe the Government's best interests **can be** met* by competing the JFO, 13F and KMS

---

[8] Apparently, CO Slagle retired, two days later, on July 31, 2020, and was replaced by another as the cognizant contracting officer for the JFOC procurement. ECF No. 40 at 5.

requirements under the MICC-Fort Eustis recently awarded TMS MAIDIQ. Both *time and money can be saved* by the Government in pursuit of this avenue. Time and money are expended on soliciting and awarding interim short term contract actions to support on-going requirements. Contract periods can be adjusted to support a Base and Four Option periods on most requirements thus saving manpower and costs tied to phase-in and certification of new contractor employees. Longer periods of performance also support the Government's ability to successfully recruit and retain qualified personnel on existing requirements, thereby ensuring continuity of the training mission.

*Id.* at 620 (AR 616) (emphasis added). Her memorandum also referenced 11 enclosures that further detailed the development and scope of the TMS MAIDIQ, but that did not otherwise address, in any way, the corrective action or any cancellation decisions. *Id.* at 621–862 (AR 617–858).[9] The August 10 MFR does not itself purport to be a solicitation cancellation decision, nor is it a recommendation to another agency official.

### E.    Procedural History

On August 31, 2020, TTGI filed its initial complaint against the United States, in this Court. *See* ECF No. 1. On September 3, 2020, PTP filed an Unopposed Motion to Intervene, pursuant to Rule 24 of the Rules of the United States Court of Federal Claims ("RCFC"), which the Court granted. Minute Order (Sep. 3, 2020). On September 4, 2020, TTGI filed an amended complaint. TTGI Am. Compl. at 1.

---

[9] Subsequently, on August 21, 2020 – presumably based on her August 10 MFR – CO Abraham authored an additional internal agency memorandum, documenting that "a reevaluation of the acquisition strategy has resulted in the decision to solicit [the 13F Solicitation] requirement under the recently awarded [TMS] Contract awarded by the [MICC] Fort Eustis" as "[t]he requirements addressed by this specific task order were included within the scope of the TMS and support the long term, continuous service need of Fort Sill." *Id.* at 1235 (AR 1231). That same day, the Army notified PTP and TTGI that "after thoughtful review, the decision has been made to utilize [the 13F Solicitation] requirement to support [the 13F Solicitation] requirement." *Id.* at 1236–37 (AR 1232–33) (August 21, 2020 letter to PTP); ECF No. 1 Appendix A (August 21, 2020 letter to TTGI). Regarding the JFOC Solicitation, however, the Administrative Record does not appear to contain any materials documenting the agency's final decision to utilize the TMS MAIDIQ instead of the JFOC Solicitation (*i.e.*, subsequent to the August 10 MFR). The Administrative Record also does not appear to contain any actual cancellation of the 13F or JFOC Solicitations. Nevertheless, the parties do not dispute – and the Court agrees – that, as a practical matter, the agency's decision to abandon the 13F and JFOC Solicitations constitutes a final agency decision that is ripe for review.

In the amended complaint, TTGI maintains that the Army's decision to cancel the 13F Solicitation was not rationally related to the "alleged procurement defect" which had been raised in PTP's GAO protest and was instead a "decision solely because [the Agency] likes the New Ft. Sill IDIQ better than the GSA schedule contract it used originally." TTGI Am. Compl. at ¶¶ 30, 33. Moreover, TTGI contends that by "mov[ing] the unchanged requirements to the New Ft. Sill IDIQ, where only large businesses are eligible for award" the Army violated the "Rule of Two." *Id.* at ¶¶ 36–38. Accordingly, TTGI asks that this Court "permanently enjoin the Agency proceeding with its corrective action as implemented." *Id.* at 10–11.

Although PTP initially entered this case as an intervenor, PTP sought leave to file a separate complaint and requested that its new case be consolidated with TTGI's case. ECF No. 26. On September 29, 2020, the Court granted PTP's motion to file its own complaint. ECF No. 28.[10] PTP's complaint advances similar claims to those of TTGI. Specifically, PTP alleges that the Army's decision to cancel the 13F and JFOC Solicitations was arbitrary and capricious because "there is no documented cancelation decision for either procurement. And, to the extent there are any record materials that shed light on the Agency's decision, the record materials do not justify cancellation." PTP Compl. at ¶¶ 5, 45–48. Further, PTP contends that, by cancelling the 13F and JFOC Solicitations for the purpose of reissuing the requirements using the TMS MAIDIQ, the Army violated the Rule of Two. *Id.* at ¶¶ 87–90, 104–08. Accordingly, PTP seeks injunctive relief, ordering the Army to refrain from cancelling (or to reinstate) the 13F or JFOC Solicitations and from resoliciting those requirements "absent Agency compliance with the Rule of Two and all other applicable regulations." *Id.* at ¶¶ 66, 78, 95, 111.

On September 18, 2020, the government filed the Administrative Record. ECF No. 25. On September 5, 2020, TTGI and PTP filed motions for judgment on the Administrative Record ("MJAR") and the government filed a cross-motion for judgment on the Administrative Record. ECF No. 29-1 ("PTP MJAR"); ECF No. 30 ("Def. MJAR"); ECF No 31 ("TTGI MJAR"). On October 12, 2020, the parties filed their respective response briefs. ECF No. 32 ("PTP Resp."); ECF No. 33 (Def. Resp."); ECF No. 34 ("TTGI Resp.").

On October 16, 2020, the Court held oral argument. ECF No. 35. Following oral argument, the Court ordered the parties to file supplemental briefs addressing a variety of specific issues that had not been covered in the parties' briefs or at oral argument. ECF No. 39. In particular, the Court ordered supplemental briefing for the parties to address several issues, including the application of 10 U.S.C. § 2305(b)(2) to the agency's cancelation decision. ECF No. 39; *see* 10 U.S.C. § 2305(b)(2) ("[A] solicitation may be

---

[10] The caption in this case has been revised to reflect PTP's position as a plaintiff only, given the nature of PTP's claims in its complaint and the arguments in PTP's motion for judgment on the administration record.

rejected if the head of the agency determines that such action is in the public interest.").
On October 28, 2020, the government filed its supplemental brief, ECF No. 40 ("Def.
Supp. Br."), and, on November 2, 2020, both PTP and Tolliver filed their respective
supplemental briefs.  ECF No. 41 ("PTP Supp. Br."); ECF No. 42 ("TTGI Supp. Br.").

## II.    Jurisdiction

Both Plaintiffs seek relief pursuant to 28 U.S.C. § 1491(b)(1).  TTGI Am. Compl. at
¶ 2; PTP Compl. at ¶ 18.  In that regard, the Tucker Act, as amended by the
Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat.
3870, provides this Court with "jurisdiction to render judgment on an action by an
interested party objecting [1] to a solicitation by a Federal agency for bids or proposals
for a proposed contract *or* [2] to a proposed award *or* [3] the award of a contract *or* [4]
any alleged violation of statute or regulation in connection with a procurement or a
proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis and alterations added).[11]

The government concedes that this "Court's jurisdiction extends to an agency's
decision to cancel a solicitation."  Def. MJAR at 15 (citing *Madison Servs., Inc. v. United
States*, 92 Fed. Cl. 120, 125–26 (2010), and *FFTF Restoration Co., LLC v. United States*, 86

---

[11] This Court reads the statute as the United States Court of Appeals for the Federal Circuit, our
appellate court, interpreted it in *Sys. Application & Techs., Inc. v. United States*, where the Federal
Circuit counted four separate causes of action: "On its face, the statute grants jurisdiction over
[1] objections to a solicitation, [2] objections to a proposed award, [3] objections to an award,
and [4] objections related to a statutory or regulatory violation so long as these objections are in
connection with a procurement or proposed procurement."  691 F.3d 1374, 1380–81 (Fed. Cir.
2012); *see also Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 173, 174 (2011) (explaining that "this
provision [§ 1491(b)(1)] grants the Court jurisdiction over [objections to] (1) a 'solicitation,' (2) a
'proposed award' (3) an 'award' or (4) 'any alleged violation of statute or regulation in
connection with a procurement or a proposed procurement'").  The government, on occasion,
also has counted four separate prongs.  *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl.
226, 234 (2009) ("The government further contends that, because 28 U.S.C. § 1491(b)(1) only
allows for objections to (1) 'a solicitation by a Federal agency for bids or proposals for a
proposed contract,' (2) 'a proposed award,' (3) 'the award of a contract,' or (4) 'any alleged
violation of statute or regulation in connection with a procurement or a proposed procurement,'
see 28 U.S.C. § 1491(b)(1). . . .").  Although some decisions group the statute into just three
prongs, *Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208 (2010), the critical point, as
explained *infra*, is that the objection "to a solicitation" prong or cause of action is distinct from
the others, and the first two or three prongs – again, depending on how they are counted – are
themselves distinct from the final prong, permitting an objection to "any alleged violation" of
law in connection with a procurement.  95 Fed. Cl. at 212 ("The first two portions of Section
1491(b)(1) address pre-award and post-award bid protests" while "the third portion of the
Section concerns protests involving 'any alleged violation of statute or regulation in connection
with a procurement or a proposed procurement.'").

Fed. Cl. 226, 236–37 (2009)).  This Court has a duty, however – as does every Federal court – to assure itself of jurisdiction over any complaint or cause of action.  *Folden v. United States*, 379 F.3d 1344, 1354 (Fed Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte.*"); RCFC 12(h)(3).  Thus, although the Court generally agrees with both Plaintiffs and the government with regard to jurisdiction here, we write at greater length to address the unique aspects of a FAR Part 8 procurement, generally, and the facts and circumstances of the procurements at issue here, in particular.

### A.   Source Of Jurisdiction For Challenges To Cancellation Of FAR Part 8 Procurements

We begin, as always, with the plain language of the applicable jurisdictional statutory provision, in this case 28 U.S.C. § 1491(b)(1).  A plaintiff's claim that a government agency improperly has cancelled a solicitation is plainly not a challenge "[1] to a solicitation . . . or [2] to a proposed award or [3] the award of a contract…" (alterations added).  For the reasons explained in this subsection, this Court concludes, however, that it possesses jurisdiction to decide Plaintiffs' claims that the agency improperly decided to cancel the solicitations at issue, pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1); Plaintiffs sufficiently have alleged "[a] violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In that regard, "[a] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction.''  *Distributed Sols., Inc. v. United States,* 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008)).  That standard is easily met here.  TTGI Am. Compl. at ¶¶ 31–38; PTP Compl. at ¶¶ 64–66, 76–78, 81–95; *see also* TTGI Supp. Br. at 3; PTP Supp. Br. at 6–7.  In particular, Plaintiffs' respective complaints regarding the agency's cancellation decisions sufficiently allege a violation of FAR 1.602-2(b) and 10 U.S.C. § 2305(b)(2).[12]

### 1.   FAR 1.602–2(b)

The basis for this Court's jurisdiction to decide a challenge to an agency's cancellation of a procurement solicitation is not unambiguous; it is certainly not explicit

---

[12] This subsection only addresses the Court's jurisdiction to review the merits of the agency's solicitation cancellation decisions.  The Court separately has jurisdiction –  pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1) – to consider Plaintiffs' independent claims that the government violated FAR 19.502-2 and FAR 19.502-9, provided that the FASA task order protest bar does not apply to such allegations.  *See, infra,* Section II.B.  The Court recognizes that the question of whether Plaintiffs may obtain relief for the government's alleged violation of any of these provisions may be more accurately viewed as merits issues, *Perry v. United States*, 149 Fed. Cl. 1, 10-14 (2020), but that distinction is not critical here given the outcome.

in the text of 28 U.S.C. § 1491.  While the Federal Circuit has upheld this Court's jurisdiction to consider challenges to an agency's allegedly improper cancellation of a solicitation, those decisions involved solicitations issued pursuant to FAR Part 14 or 15, which contain specific provisions governing cancellation.  For example, in *Croman Corp. v. United States*, 724 F.3d 1357, 1359, 1363 (Fed. Cir. 2013), the Federal Circuit reviewed the reasonableness of the cancellation of a FAR Part 15 ("Contracting By Negotiation") procurement, where the regulations require that "[t]he source selection authority may [only] reject all proposals received in response to a solicitation, *if doing so is in the best interest of the government*."  FAR 15.305(b) (emphasis added).  More recently, in *Veterans Contracting Grp., Inc. v. United States*, 920 F.3d 801, 806 (Fed. Cir. 2019), the Federal Circuit addressed whether an agency acted reasonably in canceling a FAR Part 14 ("Sealed Bidding") procurement, where the regulations mandate that after the opening of bids there must be "*a compelling reason* to reject all bids and cancel the invitation."  FAR 14.404-1(a)(1) (emphasis added); *see* FAR 14.404-1(c).

In such cases, the Federal circuit has invoked the APA standard of review applicable to § 1491(b)(1) claims, explaining that "[u]nder this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making process involved a clear and prejudicial violation of statute, regulation, or procedure."  *Croman*, 724 F.3d at 1363.  In particular, in *Croman*, the Federal Circuit observed that "[i]n reviewing [an agency's] exercise of discretion, this court has articulated relevant factors as general guidelines in determining whether [the agency's] actions were arbitrary, capricious, or an abuse of its discretion."  724 F.3d at 1365.  "'[R]elevant factors include: subjective bad faith on the part of the officials; the absence of a reasonable basis for the administrative decision; the amount of discretion entrusted to the procurement officials by applicable statutes and regulations; and proven violation of pertinent statutes or regulations.'"  *Id.* (quoting *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988) (quoting *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203–04 (Ct. Cl. 1974))).[13]

In neither *Croman* nor *Veterans Contracting*, however, did the Federal Circuit identify which prong of § 1491(b)(1) was at issue, but, notably, both *Prineville Sawmill*

---

[13] There is a difference in the requirements applicable to the cancellation of a sealed bidding procurement as compared to a negotiated procurement.  "In contrast to sealed bidding, in a negotiated procurement . . ., [GAO] decisions have found that 'the contracting officer need only have a reasonable basis for cancellation after receipt of proposals, as opposed to the cogent and compelling reason required for cancellation of a solicitation after sealed bids have been opened [,] ... because in sealed bidding competitive positions are publicly exposed as a result of the public opening of bids, while in negotiated procurements there is no public opening.'"  *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 511 (2008) (quoting *Cantu Servs., Inc.*, B–219998, 89-1 CPD ¶ 306, 1989 WL 240549, *1 (Mar. 27, 1989) (internal quotations omitted)).

and *Keco Indus., Inc.* involved a prior version of the Tucker Act, pursuant to which this Court's predecessor had jurisdiction under § 1491(a) to decide whether the government breached an implied contractual duty to fairly consider responsive bids or proposals. *Prineville Sawmill*, 859 F.2d at 909 ("An invitation for bids issued by the government carries, as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids."); *see also Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994) (holding that plaintiff "showed that GSA had *no rational basis* for the cancellation" in case brought pursuant to § 1491(a) and the prior version of the Tucker Act, as amended by the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, § 133(a), 96 Stat. 25 (emphasis added)). This, of course, tends to demonstrate that our jurisdiction to decide such procurement cancellation cases was imported into § 1491(b), following ADRA. *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010) (holding that "[t]he legislative history makes clear that the ADRA was meant to unify bid protest law in one court under one standard" and that "it seems quite unlikely that Congress would intend that statute to deny a pre-existing remedy without providing a remedy under the new statute").

Turning back to 28 U.S.C. § 1491(b)(1), while the case law makes clear that a plaintiff's challenge to the rationality of an agency's cancellation of a solicitation may be brought as an alleged violation of FAR 14.404-1 or FAR 15.305(b) in, respectively, a sealed bid (FAR Part 14) or negotiated procurement (FAR Part 15), the jurisdictional (and merits) questions in this case are complicated by the fact that the cancelled solicitations were issued pursuant to FAR Part 8, under the FSS program, and thus are not subject to either FAR Part 14 or FAR Part 15 cancellation provisions. *See* 28 U.S.C. § 1491(b)(1) (covering an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement"). In other words – given the absence of any analogous FAR Part 8 provision governing an agency's solicitation cancellation – does our Court possess jurisdiction to decide a challenge to an agency's cancellation of a solicitation issued under FAR Part 8?

Judge Wolski decided that precise question in *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503 (2011). In that case, Judge Wolski held that "the protest of a cancellation of a solicitation is not an 'objecti[on] to a solicitation ... for bids or proposals for a proposed contract or to a proposed award or the award of a contract.'" 102 Fed. Cl. at 523 (quoting 28 U.S.C. § 1491(b)(1)). Therefore, the statutory "phrase 'or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement,' . . . must be the vehicle by which the remainder of our pre-existing jurisdiction over procurement protests was preserved." 102 Fed. Cl. at 523.

This Court concurs with *MORI* that the fourth-prong of 28 U.S.C. § 1491(b)(1) – covering an alleged violation of law in connection with a procurement or a proposed

procurement – provides the necessary ballast for solicitation cancellation cases,[14] but, as Judge Wolski correctly observed, and as noted above, FAR 15.305(b) "does not apply to FSS procurements such as the . . . procurement cancelled" in the instant case. *Id.* (citing FAR 8.404(a) and rejecting various "provisions plaintiff cites from the FSS subpart of the FAR" as a basis for such jurisdiction). In the absence of a specific cancellation provision, "[the Court] should look for a regulation codifying the duty to fairly consider bids, as the repository of the remainder of our bid protest jurisdiction." 102 Fed. Cl. at 523 (explaining that pre-ADRA, "our court's jurisdiction over challenges to solicitation cancellations was not based on the violation of a regulation specifically addressing cancellation, but rather on the implied contract to fairly and honestly consider bids"). In that regard, *MORI* "holds that that the FAR section 1.602–2(b) requirement that contracting officers shall '[e]nsure that contractors receive impartial, fair and equitable treatment' is, among other things, the codification of the government's duty, previously implicit, to fairly and honestly consider bids." 102 Fed. Cl. at 523–24 (concluding that "numerous opinions of our court have treated FAR section 1.602–2(b) as a binding requirement the violation of which may be reviewed in a bid protest"). In other words, just as this Court, pre-ADRA, would have been able to hear a challenge to the cancellation of a solicitation under the FSS program pursuant to 28 U.S.C. § 1491(a), we may continue to do so under the fourth prong of § 1491(b) as an alleged violation of FAR 1.602-2(b).

Despite the government's initial concession in its motion for judgment on the Administrative Record, acknowledging our jurisdiction to review the solicitation cancellation decisions at issue, *see* Def. MJAR at 15,[15] the government later "disagree[d]

---

[14] *See also* Def. Supp. Br. at 6 ("An action challenging a cancelation decision does not challenge a solicitation for bids or proposals or a proposed award."). This appears to be the government's consistent position, and the Court concurs that the government is correct. *See MCI Diagnostic Ctr., LLC v. United States*, 147 Fed. Cl. 246, 270 (2020) (noting the government's argument that plaintiff "challenges only the VA's decision to cancel the solicitation ... and the protest of a cancellation is not an 'objecti[on] to a solicitation ... for bids or proposals for a proposed contract or to a proposed award or the award of a contract'").

[15] The government in its MJAR relied upon *Madison Servs., Inc.*, 92 Fed. Cl. at 125–26, and *FFTF Restoration Co.*, 86 Fed. Cl. at 236–37, in conceding that the Court of Federal Claims possesses jurisdiction to review an agency's decision to cancel a solicitation. Def. MJAR at 15. In *FFTF Restoration*, Judge Firestone – in addition to relying upon FAR 15.305(b) – "reject[ed] the government's attempt to carve out challenges to negotiated procurement cancellations from this court's bid protest jurisdiction" because "28 U.S.C. § 1491(b)(1) authorizes this court to review cancellations of negotiated procurements to ensure compliance with the requirements of 'integrity, fairness, and openness' in FAR 1.102(b)(3) and the requirement that '[a]ll contractors and prospective contractors shall be treated fairly and impartially' in FAR 1.102–2(c)(3)." *FFTF Restoration*, 86 Fed. Cl. at 237 & n.15. In *Madison Servs.*, this Court held that "the decision to

13

with the conclusion in *MORI* that FAR 1.602-2(b) confers jurisdiction upon this Court over any general allegation of an arbitrary decision to cancel a solicitation that is not instead based on a specific violation of statute or regulation."  Def. Supp. Br. at 6. According to the government in its supplemental brief, "a contracting officer cannot violate FAR 1.602-2(b) by taking an action that a plaintiff deems 'unfair,' unless the contracting officer violated another, specific substantive provision of the FAR."  *Id.* at 7.

The government's contentions must be rejected for several reasons.  First, a recent Federal Circuit decision all but precludes the government's position.  *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) ("The [FAR] requires an agency to treat offerors fairly and impartially.  [FAR] 1.602–2(b) . . . . This obligation necessarily encompasses an agency's obligation to fairly and impartially evaluate all proposals.").[16]  Second, apart from the Federal Circuit's decision in *Office Design Grp.*, the great weight of authority supports Plaintiffs' position that FAR 1.602-2(b) *is* indeed "substantive" and supports a claim under the fourth prong of 28 U.S.C. § 1491(b)(1). *MORI*, 102 Fed. Cl. at 524 (cataloging decisions that "reinforce[] the Court's conclusion that FAR section 1.602–2(b) is the place where the formerly implied contract now expressly resides" and holding "that this provision is violated by government actions which would have breached the implied duty to fairly and honestly consider bids, and thus such actions—including arbitrary cancellations of solicitations—would be the 'violation of ... regulation in connection with a procurement'"); R. Nash, *FAIR TREATMENT OF CONTRACTORS: Do FAR Provisions Confer Rights?*, 27 NO. 7 Nash & Cibinic Rep. ¶ 35 (noting that "[t]here are numerous Court of Federal Claims decisions relying on FAR 1.602-2(b) to find a substantive right of a contractor" and commenting that "it is good to see the Court of Federal Claims finding that the FAR confers a right of contractors to fair treatment").[17]

---

cancel a negotiated procurement remains subject to the court's review, pursuant to 28 U.S.C. § 1491(b) and the APA standard."  92 Fed. Cl. at 125; see *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 114–15 (2011) (surveying the prior case law, and "conclud[ing] that Judge Firestone's decision in *FFTF Restoration* is on point and should be followed by this Court.").

[16] *See also Krygoski Const. Co. v. United States,* 94 F.3d 1537, 1542–43 (Fed. Cir. 1996) ("CICA mandates impartial, fair, and equitable treatment for each contractor.  This competitive *fairness requirement*, with its *bid protest remedies*, restrains a contracting officer's contract administration. If, for instance, a contracting officer discovers that the bid specifications inadequately describe the contract work, regulations promulgated under CICA may compel a new bid." (emphasis added) (citing 10 U.S.C. §§ 2304 and 2305 (1994), and FAR 1.602–2)).

[17] *See also, e.g., MCI Diagnostic Ctr.,* 147 Fed. Cl. at 272 ("It is, therefore, consistent with *Resource Conservation Group* to hold that this court continues to have jurisdiction over alleged arbitrary cancellations of procurement solicitations.  Moreover, given this court's pre-ADRA jurisdiction to address procurement cancellation issues, it follows that whether or not protestor alleges the

### 2.     10 U.S.C. § 2305(b)(2)

Even if FAR 1.602–2(b) were construed not to provide a basis for this Court's review of a challenge to a solicitation cancellation in a FAR Part 8, FSS procurement, the Court holds that, in this case, 10 U.S.C. § 2305(b)(2) *does* provide such a predicate for this Court's jurisdiction, again pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1).  In that regard, and as noted above, the Court ordered the parties to submit supplemental briefs addressing 10 U.S.C. § 2305(b)(2), which provides that "[a]ll sealed bids or competitive proposals received in response to a solicitation may be rejected if the *head of the agency* determines that such action is *in the public interest*" (emphasis added).  Given that FAR 15.305(b) may serve as a jurisdictional predicate where applicable, the Court has no trouble concluding that almost identical language in 10 U.S.C. § 2305(b)(2) similarly provides jurisdiction here.  Although FAR Part 15 provisions do not apply wholesale to the procurements at issue, the referenced Title 10 statutory provision does apply by its terms.  The Court further notes that the statutory provision contains a heightened procedural requirement of a determination by the "head of the agency" and a heighted substantive requirement that a cancellation be "in the public interest" and not merely "in the best interest of the government" as in FAR 15.305(b).  *See* 10 U.S.C. § 2305(b)(2).

The government contends that 10 U.S.C. § 2305(b)(2) is inapplicable to the cancelled solicitations because the agency did not seek "competitive proposals."  Def. Supp. Br. at 1–2.  According to the government, the FAR distinguishes between

---

violation of a specific statute or regulation, this court continues to be able to address cancellation issues."); *B & B Med. Servs., Inc. v. United States*, 114 Fed. Cl. 658, 660 (2014) ("Given our long history of entertaining such [arbitrary procurement cancellation] protests, the Court does not find subject-matter jurisdiction to be absent merely because the particular regulation that is violated by arbitrary cancellation is absent from the complaint."); *Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 313 (2018) ("The [FAR] requires that contracting officers '[e]nsure that contractors receive impartial, fair, and equitable treatment.'" (quoting FAR 1.602-2(b))); *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 413 (2018) (holding that "[f]airness in government procurements is enshrined in a number of FAR provisions[,]" including FAR 1.602–2(b)); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 512 (2013) ("Contracting officers are required to 'ensure that contractors receive impartial, fair, and equitable treatment.'" (quoting FAR 1.602–2(b))); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 482 (2008) (noting "agency's fundamental duty to '[e]nsure that contractors receive impartial, fair and equitable treatment'" (quoting FAR 1.602–2))); *Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 619 (2007) ("The [FAR] impose[s] upon the Air Force the affirmative duty to '[e]nsure that contractors receive impartial, fair, and equitable treatment' *during the procurement process*." (citing FAR 1.602–2(b)) (emphasis added)), *aff'd*, 283 F. App'x 813 (Fed. Cir. 2008); *Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430, 445 (2017) (holding that plaintiff "sufficiently alleged that the Army violated applicable regulations in connection with the . . . procurement" (citing FAR 1.602–2(b))).

procurements seeking "competitive proposals" and those involving "competitive procedures":

> FAR 6.102(d)(3) provides that the "[u]se of multiple award schedules issued under the procedures established by the Administrator of General Services consistent with the requirement of 41 U.S.C.152(3)(A) for the multiple award schedule program of the General Services Administration is a *competitive procedure*" (emphasis added).   FAR 6.102(b) explicitly defines "competitive proposal" as "other" than a subsection (d) "competitive procedure[.]"

Def. Supp. Br. at 2.  The Court rejects the government's argument for two reasons: (1) the hypothesized dichotomy between a procurement requesting "competitive proposals" and a procurement involving "competitive procedures" is false – there is no inherent contradiction or distinction; and (2) the cancelled solicitations at issue here in fact sought competitive proposals.  This is evident from statutory language, as well as the mechanics of a typical FAR Part 8 procurement, the latter which the agency did *not* follow in this case.

First, Title 10 of the U.S. Code consistently uses the term "competitive proposals" not in contrast with "competitive procedures" but rather only in contrast with sealed bids.  For example, 10 U.S.C. § 2302(3)(D) incorporates the definition of the term "full and open competition" found "in chapter 1 of title 41."  The latter statutory section, in turn, defines "full and open competition" to "mean[] that all responsible sources are permitted to submit *sealed bids or competitive proposals* on the procurement."  41 U.S.C. § 107 (emphasis added).  Similarly, 10 U.S.C. § 2304(a)(2)(B) provides that "the head of an agency . . . shall request competitive proposals if sealed bids are not appropriate. . . ." *Cf.* 41 U.S.C. § 3701(a) ("An executive agency shall evaluate *sealed bids* and *competitive proposals*, and award a contract, based solely on the factors specified in the solicitation." (emphasis added)).  The solicitations at issue were not invitations for sealed bids.

Second, although the government relies on FAR 6.102, as explained above, to argue that "competitive proposals" are synonymous with FAR Part 15 procurements, that thread quickly unravels as the Court follows it through.  For example, FAR 6.401 indicates that "[s]ealed bidding and competitive proposals, as described in parts 14 and 15, are both acceptable procedures for use under subpart[] 6.1," which, of course, includes FAR 6.102.  Furthermore, FAR 6.401(b) covers "competitive proposals" and references FAR Part 15 "for procedures"; but, FAR 15.000 itself – similar to the statutory provisions discussed above – distinguishes only between negotiated procurements and sealed bidding.  *See* FAR 15.000 (noting that "[t]his part prescribes policies and procedures governing competitive and noncompetitive negotiated acquisitions" and providing that "[a] contract awarded using other than sealed bidding procedures is a

negotiated contract"). The cancelled solicitations in this case contemplated negotiated procurements and did not follow "sealed bidding procedures." *Id.*

Accordingly, while the Court agrees with the government that the cancelled solicitations at issue were not subject to FAR Part 15 *per se*, Def. Supp. Br. at 3–5, the Court agrees with the PTP that the solicitations nevertheless constituted "negotiated procurements" that solicited "competitive proposals" pursuant to a Request for Proposals ("RFP"). *See* PTP Supp. Br. at 8–9 ("Although the Agency may have had the authority to structure the Solicitations as RFQs seeking only <u>responsive quotes</u>, the Agency here issued unmistakable RFPs, seeking <u>competitive proposals</u> that the Agency could evaluate and accept." (emphasis added)). The Administrative Record thoroughly supports PTP's position in that regard. For example, the July 10, 2020 Task Order Decision Document ("TODD") for the 13F procurement, signed by the Contracting Officer, *see* ECF No. 25 at 346–55 (AR 342–51), admits that the "solicitation was placed against the GSA MAS . . . as a 100% [SDVOSB] set-aside competitive action using order procedure under [FAR] 8.405-2 ***in conjunction with FAR Part 15-Contract by Negotiation*** and FAR Part 12-Acquisition of Commercial Items." *Id.* at 346 (AR 342) (emphasis added).

Moreover, the Administrative Record confirms that the agency engaged in negotiations insofar as "[p]roposal revisions were allowed and offerors could submit a final offer based on changes provided on solicitation amendments." *Id.* at 348 (AR 344) (also citing FAR 15.404-1 regarding price analysis); *see also* AR 350 (citing FAR 15.403 regarding "adequate price competition"). Similarly, the JFOC Past Performance Questionnaire explicitly informed prospective references that the agency's planned "schedule will allow sufficient time to analyze the data prior *to the start of negotiations*." *Id.* at 499 (AR 495) (emphasis added). The JFOC TODD indicated that the FAR Part 8 RFP "was placed against the GSA MAS . . . as a 100% [SDVOSB] set-aside competitive action using ***FAR Part 15-Contract by Negotiation*** and FAR Part 12-Acquisition of Commercial Items." *Id.* at 565 (AR 561) (emphasis added). As part of the JFOC procurement, the agency conducted discussions and permitted final proposal revisions. AR 563 (indicating that "[t]wo of the four offerors made changes and submitted Final Offers"). As this Court has noted, "the acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for proposals to be revised or modified." *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 44 (2010) (quoting *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 230 (2008)). A solicitation that contemplates the submission of proposals and the possibility of discussions is a negotiated procurement.

The government itself further admits that the procurements at issue in this case are "negotiated procurement[s]." Def. MJAR at 15 (acknowledging that "[i]n the context of a negotiated procurement ***like this one***," the contracting officer's cancellation decision is subject to the APA review standard in § 1491(b)(4) (emphasis added)); *id.* at 16 (addressing the "Court's review of a cancellation decision in the course of a

negotiated procurement" and arguing that "[b]ecause the contracting officer has the discretion to cancel a negotiated procurement," a plaintiff must show the decision "had no rational basis").  As demonstrated above, a negotiated procurement involves competitive proposals.  *See PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 12 (2006) ("This federal statute provides that, in negotiated procurements, agencies 'shall evaluate ... competitive proposals and make an award based solely on the factors specified in the solicitation.'" (quoting 10 U.S.C. § 2305(b)(1))).

The government's attempt to distinguish the solicitations at issue from a procurement seeking competitive proposals is particularly unavailing where, as here, the government did not follow normal FAR Part 8 procedures.  In that regard, the government is correct that, *typically*, there *is* a distinction between procurements conducted pursuant to FAR Parts 14 and 15, on the one hand, and FAR Part 8 procurements, on the other: the former solicit bids or proposals from bidders or offerors, respectively, while the latter solicits quotations.  FAR 2.101 delineates the difference:

> *Offer* means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called "bids" or "sealed bids"; responses to requests for proposals (negotiation) are offers called "proposals"; however, responses to requests for quotations (simplified acquisition) are "quotations", not offers.

FAR 2.101 (emphasis added).[18]

The GAO also helpfully has explained that a request for quotation ("RFQ") is nothing more than a request for information:

> The submission of a bid or proposal constitutes, by its very nature, an offer by a contractor that, if accepted, creates a binding legal obligation on both parties.  Because of the binding nature of bids and offers, they are held open for acceptance within a specified or reasonable period of time . . . .

---

[18] *Cf.* FAR 13.004(a) ("A quotation is not an offer and, consequently, cannot be accepted by the Government to form a binding contract. Therefore, issuance by the Government of an order in response to a supplier's quotation does not establish a contract. The order is an offer by the Government to the supplier to buy certain supplies or services upon specified terms and conditions. A contract is established when the supplier accepts the offer.").

A quotation, on the other hand, is not a submission for acceptance by the government to form a binding contract; rather, vendor quotations are purely informational. *In the RFQ context, it is the government that makes the offer*, albeit generally based on the information provided by the vendor in its quotation, and no binding agreement is created until the vendor accepts the offer.   FAR § 13.004(a).   A vendor submitting a price quotation therefore could, the next moment, reject an offer from the government at its quoted price.  Because vendors in the RFQ context hold the power of acceptance and their submissions are purely informational, there is nothing for vendors to hold open.

*Sea Box, Inc.*, B-405711, 2012 CPD ¶ 116, 2012 WL 924951, *2–*3 (Mar. 19, 2012) (internal citations omitted) (emphasis added).[19]

In this case, in contrast, the agency did not merely solicit quotes resulting in a purchase order to the putative awardees.  Rather, the agency solicited competitive proposals pursuant to RFPs, contemplated negotiations, and awarded contracts based upon those proposals.[20]  ECF No. 25 at 5 (AR 1) (13F Solicitation); *id.* at 386 (AR 382) (JFOC Solicitation); *id.* at 244-45 (AR 240-41) (F13 TODD consistently using the term "proposals"); *id* at 565-66 (AR 561-62) (JFOC TODD consistently using the term "proposals").

Because the solicitations at issue here were RFPs seeking competitive proposals as part of a negotiated procurement – and were neither Invitations for Bids ("IFBs") nor Requests for Quotations ("RFQs"), *see* PTP Supp. at 8 – the Court concludes that the agency had to comply with 10 U.S.C. § 2305(b)(2).  The FAR's definition of "solicitation"

---

[19]  "Though GAO opinions are not binding on this court, . . . this court may draw on GAO's opinions for its application of this expertise."  *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (citing Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)); *see Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 140 n.6 (2020) ("GAO decisions are not binding on the Court but may be treated as persuasive authority in light of GAO's expertise in the bid protest arena.").

[20] The GSA itself warns against using an RFP for FSS purchases, but that is exactly what the agency did here.  https://interact.gsa.gov/wiki/its-rfq-quote-rather-rfp-offer-when-talking-about-orders-against-schedules-far-84 ("It is inappropriate and contrary to FAR SubPart 8.4 to call a Schedule order request for quotation an 'RFP.'  The FAR never recognizes 'RFP' as a suitable substitute for a Schedule order's 'RFQ.'  As the FAR (as well as the Government Contracts Reference Book and other sources) point out, 'RFP' and 'RFQ' are not interchangeable.  They differ in when offer and acceptance occurs.  When talking about Schedule orders, only 'RFQ' is recognized by the FAR.") (last visited Nov. 25, 2020).

proves the point: "*Solicitation* means any request to submit offers or quotations to the Government.  Solicitations under sealed bid procedures are called 'invitations for bids.'  *Solicitations under negotiated procedures are called 'requests for proposals.'*"  FAR 2.101 (emphasis added).  Accordingly, in this case, the cancelled solicitations were not IFBs or RFQs, but rather were RFPs – that is, "requests for proposals" as part of negotiated procurements conducted under FAR Part 8.  *Id.*  That is all that is necessary for 10 U.S.C. § 2305(b)(2) to apply, and the government cannot now, for the purposes of litigation, recharacterize the procurements as typical FSS purchases seeking only quotations.  *Aiken v. United States*, 4 Cl. Ct. 685, 694 (1984) ("party characterizations or mere contract formalisms cannot alter the substance of a transaction"); *Burstein v. United States*, 622 F.2d 529, 537 (Ct. Cl. 1980) ("[W]e must look to the substance of the transaction; the true nature of the arrangement cannot be altered by mere contractual formalisms."); *see IBM U.S. Fed., A Div. of IBM Corporation*, B-409806, 2014 CPD ¶ 241, 2014 WL 4160022, *6 (Aug. 15, 2014) ("Where, as here, an agency . . . uses an approach more akin to a competition in a negotiated procurement than to a simple FSS buy, GAO will review the record to ensure that the procurement was conducted on a fair and reasonable basis and consistent with standards generally applicable to negotiated procurements."); *Omniplex World Servs. Corp.*, B-291105, 2002 CPD ¶ 199, 2002 WL 31538212, *3 (Nov. 6, 2002) ("[W]hile the provisions of FAR Part 15, which govern contracting by negotiation, do not directly apply, . . . we analyze [the protestor's] contentions by the standards applied to negotiated procurements."); *Allied Tech. Grp., Inc.*, B-402135, 2010 CPD ¶ 152, 2010 WL 2726056, *4 n.8 (Jan. 21, 2010) ("The procurement here was conducted under the FSS provisions of FAR subpart 8.4, and thus the negotiated procurement provisions of FAR part 15 do not directly apply.  However, our Office has held that where agencies use the negotiated procurement techniques of FAR part 15 in FSS buys, such as discussions, we will review the agency's actions under the standards applicable to negotiated procurements.").[21]

* * * *

Plaintiffs also allege violations of FAR 19.502-2 and FAR 19.502-9, TTGI Am. Compl. at ¶¶ 36–38; PTP Compl. at ¶¶ 87–90, 104–08, independently vesting this Court

---

[21] The Court acknowledges that the GAO's decision in *The MIL Corp.*, B-297508, 2006 CPD ¶ 34, 2006 WL 305965 (Jan. 26, 2006), may be read to have reached a contrary conclusion, in part in reliance upon this Court's decision in *Systems Plus, Inc. v. United States,* 68 Fed. Cl. 206, 209–210 (2005).  Both cases are distinguishable, however, because while they involved FSS procurements having *elements* of negotiated procedures, they involved RFQs and *not* RFPs.  *The MIL Corp.*, 2006 WL 305965, *5 ("Here, the procurement was not conducted pursuant to the negotiated procedures of FAR Part 15, *nor did it involve the issuance of a request for proposals.* Rather, the procurement here was conducted under the FSS program, pursuant to the procedures set forth in FAR Subpart 8.4 and *using a request for quotations.*" (emphasis added)); *Sys. Plus, Inc.*, 68 Fed.

with jurisdiction to consider those claims pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1). Finally, even if Plaintiffs were unable to rely on any particular statute or regulation to challenge the cancellation of the solicitations at issue pursuant to 28 U.S.C. § 1491(b)(1), the Court still would have jurisdiction under 28 U.S.C. § 1491(a), although the available relief would include only proposal costs, and not injunctive relief. *See Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 41–42 (2013) ("[E]quitable relief is . . . unavailable in implied contract bid protests pursued under section 1491(a).").

## B.     The FASA Task Order Protest Bar

The FASA task order protest bar provides that "[a] *protest* is not authorized *in connection with* the issuance or *proposed issuance* of a task or delivery order . . . ." 41 U.S.C. § 4106(f)(1) (emphasis added). The government does *not* contend that the FASA task order protest bar precludes this Court's jurisdiction over Plaintiffs' claim generally challenging the propriety of the agency's solicitation cancellation decisions (*i.e.*, even though the agency intends to utilize a task order vehicle for the replacement procurement). The government argues, however, that this Court is precluded from deciding Plaintiffs' claims to the extent that they depend upon this Court's ruling on the application of the Rule of Two. Def. MJAR at 30–33.

Relying on Federal Circuit precedent in *SRA Int'l, Inc. v. United States*, 766 F.3d 1409 (Fed. Cir. 2014), where that court held that "nothing in FASA's language automatically exempts actions that are temporally disconnected from the issuance of a task order," *id.* at 1413, the government asserts that *SRA* "affirms the broad reach of FASA and establishes that a protest of the failure to conduct a rule of two analysis prior to issuing a task order [under an IDIQ] is not a colorable basis to avoid the statutory

---

Cl. at 206 (noting that the procurement at issue was an RFQ). Moreover, the GAO in *The MIL Corp.* explicitly agreed with our determination here that "the use of negotiated procedures in accordance with [FAR] Part 15 *and as evidenced by the issuance of a request for proposals*, constitutes a procurement conducted *on the basis of competitive proposals.*" *The MIL Corp.*, 2006 WL 305965, *5 (emphasis added) (citing cases in which the GAO equated "a negotiated procurement with a procurement conducted on the basis of competitive proposals"); *see also Comfort Inn South,* B-270819, 96-1 CPD ¶ 225, 1996 WL 251441, *2 (equating the term "competitive proposals" in 10 U.S.C. § 2304(a)(2)(B) with "negotiated procedures"). On another note, the Court finds it very hard to believe that the government would argue that Plaintiffs' proposals are subject to public disclosure. *See* 41 U.S.C. § 4702 ("Prohibition on release of contractor proposals") (providing that "[a] proposal in the possession or control of an executive agency may not be made available to any person under [the Freedom of Information Act,] section 552 of title 5" where "proposal" is defined as "including a technical, management, or cost proposal, submitted by a contractor in response to the requirements of a *solicitation for a competitive proposal*" (emphasis added)); *see also* 10 U.S.C. § 2305(g) (same).

21

[task order protest] bar."  Def. Mot. at 30–31.[22]  Furthermore, the government notes that the Federal Circuit in *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), has interpreted broadly the phrase "in connection with" in the Tucker Act, 28 U.S.C. § 1491(b)(1).[23]  Def. Resp. at 8–9.  Accordingly, the question that the government fairly raises is whether Plaintiffs' claims that the Army failed to perform the Rule of Two analysis (before deciding to move the 13F and JFOC scopes of work to the TMS MAIDIQ) constitute a "protest" that is "in connection with the issuance or

---

[22] Candidly, the Court notes that the government's position is far more persuasive than the Court at oral arguments gave the government credit for and, thus, the Court addresses the relevant issues at greater length.

[23] The filing of a protest with the General Accounting Office ("GAO") may trigger an automatic stay of a procurement under the provisions of the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551–56, prohibiting an agency from awarding a new contract pending a decision on the protest. *See* 31 U.S.C. § 3553(c)(1).  CICA, however, also allows an agency to override the automatic stay if it issues a written finding that "urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting" for the bid protest decision.  31 U.S.C. § 3553(c)(2); *see RAMCOR*, 185 F.3d at 1287.  In *RAMCOR*, the Federal Circuit addressed the question of "whether an objection to a [31 U.S.C.] § 3553(c)(2) override can serve as a jurisdictional basis under § 1491(b)(1)."  *Id.* at 1289.  The Federal Circuit thus had "to determine whether § 3553(c)(2) is a statute 'in connection with a procurement,' as required by § 1491(b)(1)."  *Id.*  While the Court of Federal Claims had held that a plaintiff protestor "could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award" – and that this Court accordingly lacked jurisdiction to decide an override challenge – the Federal Circuit reversed.  *Id.*  The Federal Circuit explained its reasoning as follows:

> The language of § 1491(b) . . . does not require an objection to the actual contract procurement, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement."  ***The operative phrase "in connection with" is very sweeping in scope***.  As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction.  Section 3553(c)(2) fits comfortably in that broad category.  After all, [the agency's] § 3553(c)(2) override allowed it to procure immediately [the awardee's] services.  Moreover, under that procurement, [the contact awardee] could have immediately commenced work.  Where an agency's ***actions under a statute so clearly affect the award and performance of a contract***, this court has little difficulty concluding that that statute has a "connection with a procurement."

*Id.* (emphasis added).

proposed issuance of a task or delivery order."  Def. MJAR at 30 (discussing 41 U.S.C. § 4106(f)(1)).[24]  According to the government, "[t]here simply is no way to view *the protests of the TMS MAIDIQ* as anything other than the protest of a proposed task order."  *Id.* at 32–33 (emphasis added).

This Court disagrees that Plaintiffs are protesting either the TMS MAIDIQ itself or even the "proposed issuance" of a task order.  The Court further disagrees with the government that the FASA protest bar is at all applicable here.

The Court must first appropriately frame Plaintiffs' Rule of Two arguments.  All of the parties (and the Court) appear to agree that the Army's decision to cancel the solicitations at issue depends upon the availability of the TMS MAIDIQ as a viable alternative under which the procurements may be conducted.  In other words, there is no question about the agency's continuing need for the precise services sought pursuant to the 13F and JFOC Solicitations.  Accordingly, there are several possible ways to view Plaintiffs' Rule of Two arguments.  One possible way is that the agency's cancellation decisions are irrational to the extent the agency has not performed a Rule of Two analysis in order to know whether the TMS MAIDIQ is, in fact, a viable alternative.  Another possible way to view Plaintiffs' claims is that because the agency *has* selected the TMS MAIDIQ vehicle as part of a revised acquisition strategy, *that selection* itself violated the Rule of Two, irrespective of the rationale offered in the agency's August 10 MFR.[25]  The first view ties the Rule of Two issue to the propriety or legality of the agency's cancellation decisions, while the latter view constitutes a challenge to the legality of an independent agency action.  Viewed either way, Plaintiffs' actions before this Court do not constitute a "protest . . . in connection with the issuance or proposed

---

[24] In terms of the FASA task order protest bar, the government relies exclusively upon the provision in Title 41, notwithstanding the government's contention in its supplemental brief that "Section 3701(b) of Title 41 does not apply here because nothing in Title 41, Subtitle I, Division C (§§ 3101 – 4714) applies to the Department of Defense."  Def. Supp. Br. at 2 (citing 41 U.S.C. § 3101(c)(1)(A)).  The government nowhere addresses 10 U.S.C. § 2304c(e), the task order protest bar applicable to Department of Defense ("DOD") procurements.  The difference between the two statutes is the dollar value of the GAO jurisdictional threshold; for DOD procurements, the applicable threshold is $25 million.  10 U.S.C. § 2304c(e)(1)(B).  Because there is no practical difference between the two provisions for the purposes of this decision, the instant decision discusses 41 U.S.C. § 4106(f), the statutory provision upon which the government has relied in its briefs.

[25] Even on that point, however, the government is noncommittal, in one sentence asserting that "there is no uncertainty as to what contracting vehicle *would be* selected," and then in the very next sentence asserting that "the administrative record demonstrates that the agency *has decided already* to use the TMS MAIDIQ."  Def. MJAR at 32 (emphasis added).

issuance" of a task order, nor does the Court agree with the government that Plaintiffs are protesting the TMS MAIDIQ itself (or the proposed issuance of a task order).

For the reasons explained below, the Court finds that the FASA task order bar does not apply to the present case because: (1) FASA only applies to a "protest" but that term does not necessarily encompass an action alleging an independent "violation of statute or regulation in connection with a procurement or proposed procurement"; (2) even where an action properly may be considered a "protest," FASA only applies where there is some relationship to a "proposed issuance or issuance of a task order" – that is, where a plaintiff is, in effect, a disappointed bidder or offeror; and (3) a challenge to an agency's alleged failure to conduct a Rule of Two analysis is not "in connection with" a task order, no matter how Plaintiffs' claims are viewed or how the other operative language in FASA is interpreted or parsed.

As with any question of statutory analysis, this Court starts, as it must, with the applicable statutory language.[26]  The FASA task order protest bar provides, in its entirety, as follows: "[a] protest is *not* authorized *in connection with* the *issuance or proposed issuance of a task or delivery order* except for—  (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000." 41 U.S.C. § 4106(f)(1) (emphasis added).  With respect to the latter exception, the GAO has exclusive jurisdiction to decide such claims.  *Id.* § 4106(f)(2).

The interpretative difficulty is that FASA does not provide any further definitional clarity regarding its operative terms.  Solving this puzzle requires paying close attention to the entirety of the FASA's statutory language.  While decisions from this Court and the Federal Circuit generally have focused on the "in connection with" language[27] – and that phrase's "very sweeping . . . scope," *RAMCOR*, 185 F.3d at 1289 – that is but one-third of the FASA statutory equation.  The remaining operative language that remains to be unpacked is (a) "protest" and (b) "issuance or proposed issuance of a task or delivery order," 41 U.S.C. § 4106(f)(1), both of which, in this Court's view, considerably narrow the FASA's jurisdictional bar.  *Cf. Maracich v. Spears*, 570 U.S. 48, 60 (2013) ("[T]he phrase 'in connection with' provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions.").

---

[26] *Dyer v. Dep't of the Air Force*, 971 F.3d 1377, 1380 (Fed. Cir. 2020) (quoting *Kingdomware Techs., Inc. v. United States*, –– U.S. ––, 136 S. Ct. 1969, 1976 (2016), for the proposition that "[i]n statutory construction, we begin with the language of the statute" (internal quotes omitted)).

[27] *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 502 (2012) ("There seems to be some variation in this court's approach to interpreting the term 'in connection with' when applying the ban on task order protests in particular cases.").

1.      **FASA Does Not Necessarily Bar Claims Alleging A "Violation Of Statute Or Regulation In Connection With A Procurement Or Proposed Procurement"**

The FASA task order bar applies only to "protest[s]."  This Court therefore must decide whether Plaintiffs' claims in this case – specifically with respect to the agency's alleged violation of the Rule of Two – constitute a "protest."  The Court is unconcerned with how that word is employed colloquially to describe § 1491(b) actions generally; instead, the Court focuses on the language that Congress actually enacted in its statutes. *Azar v. Allina Health Servs.*, 587 U.S. ––, 139 S. Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attached different meanings to the same term in . . . related statutes.").  In that regard, on the one hand, neither the FASA task order protest bar provision nor the Tucker Act defines the term "protest" and the question of what that term includes is not straightforward.  On the other hand, the GAO's bid protest jurisdictional statute, the Competition in Contracting Act ("CICA"),[28] defines that term as follows:

> The term "protest" means a written objection by an interested party to any of the following:
>
> (A) A solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services.
>
> (B) The cancellation of such a solicitation or other request.
>
> (C) An award or proposed award of such a contract.
>
> (D) A termination or cancellation of an award of such a contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.
>
> (E) Conversion of a function that is being performed by Federal employees to private sector performance.

31 U.S.C.A. § 3551(1); *see also* FAR 33.101 (defining "protest" similarly to CICA).[29]

---

[28] Pub. L. No. 98-369, 98 Stat. 1175 (1984) (codified, as amended, at 31 U.S.C. §§ 3551-3557).

[29] Notably, the CICA's definition of "protest" explicitly distinguishes between an objection to a solicitation, an objection to a solicitation's cancellation, and an objection to "[a]n award or proposed award."

Focusing on CICA's definition of the word "protest," a Tucker Act cause of action may be "in connection with" the issuance (or proposed issuance) of a task order, but not subject to the FASA task order protest bar because the cause of action simply does not qualify as a "protest."[30]  As a more obvious practical analogy demonstrating the accuracy of that conclusion, the government could not contend that a Contract Disputes Act ("CDA") claim qualifies as a "protest" subject to the FASA task order protest bar. *Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 770 (2014) (holding that "this matter is not within our bid protest jurisdiction, but instead involves questions of contract administration that must be brought under the CDA"); *Itility, LLC v. United States*, 124 Fed. Cl. 452, 458 (2015) (noting that "a long line of our cases has held that the 'interested party' standing to bring a bid protest does not extend to the complaints of contractors concerning the administration of contracts they have been awarded and performing"); *Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 722, 728–29 (2009) ("By its terms, the FASA prohibition on bid protests does not apply to a breach of contract case" or CDA claims).[31]

A further comparison of the FASA task order protest bar to the Tucker Act language (and *RAMCOR*'s interpretation of the latter) is instructive and demonstrates that not all § 1491(b)(1) claims qualify as a "protest."  For starters, the Tucker Act nowhere employs the term "protest" but rather refers repeatedly to "an action" (or "any action").  28 U.S.C. § 1491(b).[32]  As noted previously, the Tucker Act, as amended by ADRA, provides for four distinct causes of action related to the procurement process: "an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract **_or_** [2] to a proposed award **_or_** [3] the award of

---

[30] "The CICA and the ADRA are, after all, different statutes, with different definitions of bid protest."  *Alaska Cent. Exp., Inc. v. United States*, 50 Fed. Cl. 510, 517 (2001).

[31] *Cf. Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 992 (Fed. Cir. 2018) (noting government's position that a particular claim, dismissed by the trial court, was "a contract administration claim subject to the [CDA] over which the Claims Court had no bid protest jurisdiction").

[32] CICA explicitly distinguishes between an "action" in this Court and a "protest" before the GAO.  31 U.S.C. § 3556 (explaining that "nothing contained in this subchapter shall affect the right of any interested party to file a protest with the contracting agency or to file an action in the United States Court of Federal Claims"); *see also* 41 U.S.C. § 2101(6) ("The term 'protest' means a written objection by an interested party to the award or proposed award of a Federal agency procurement contract, pursuant to subchapter V of chapter 35 of title 31."); 31 U.S.C. § 1558 (distinguishing between a "***protest*** filed under subchapter V of chapter 35 of this title," on the one hand, and "***an action*** commenced . . . ***for a judicial remedy***" involving a "a challenge to-- (i) a solicitation for a contract; (ii) a proposed award of a contract; (iii) an award of a contract; or (iv) the eligibility of an offeror or potential offeror for a contract or of the contractor awarded the contract" (emphasis added)).

a contract __or__ [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.* § 1491(b)(1) (emphasis added). The first three causes of action are what we typically refer to as bid "protests," as that term is defined in CICA – *i.e.*, challenges, respectively, to a solicitation or to the merits of a contract award (or a proposed award). In contrast, the fourth prong of § 1491(b)(1) – pursuant to which a plaintiff may allege a "violation of statute or regulation in connection with a procurement or a proposed procurement" – is __not__ necessarily a "protest," at least as that term is defined in CICA.[33] Indeed, although "ADRA covers *primarily* pre- and post-award bid protests," the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination "that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award" or the solicitation. *RAMCOR*, 185 F.3d at 1289 (emphasis added).

Put differently, "[t]he language of § 1491(b) . . . does not require an objection to the actual contract procurement, but only to the 'violation of a statute or regulation in connection with a procurement or a proposed procurement.'" *RAMCOR*, 185 F.3d at 1289. The Federal Circuit further explained that construing § 1491(b)(1) to require a plaintiff to object to the merits of a procurement effectively would eliminate the fourth prong of the statute, as "[a] challenge on the merits would, for example, amount to an objection to 'a *proposed award or the award* of a contract.'" *Id.* (emphasis added) ("If § 1491(b) required a challenge to the merits of the contract award, the contractor would never need to use the 'violation' prong but could always rely on other jurisdictional grants in § 1491(b)(1)."). Simply put, an action under the last prong of § 1491(b) is not a "protest" because it is not a challenge to a solicitation or to the proposed award or award of a contract. In that regard, an axiomatic canon of statutory interpretation is that "[w]hen construing a statute, this court must, if at all possible, give effect to all its parts." 185 F.3d at 1289 (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973), and noting that "[t]he trial court's proposed interpretation of § 1491(b)(1) would violate this basic tenet of statutory construction"). Accordingly,

---

[33] Thus, while "the Federal Circuit has made clear that a *RAMCOR*-type action may be brought independent of whether the plaintiff objects to the actual contract procurement[,] CICA's definition of 'protest' is more limited than the scope of actions described by the Tucker Act and does not include an independent 'violation of statute or regulation in connection with a procurement or a proposed procurement' prong[.]" M. Solomson & J. Handwerker, *Subcontractor Challenges To Federal Agency Procurement Actions*, 06-3 Briefing Papers 1, *6 (Feb. 2006). That is not to say that the GAO's protest jurisdiction precludes its consideration of alleged violations of statutes or regulations, *see* 31 U.S.C. § 3552(a), but rather the GAO may only consider such allegations *as part* of a "written objection by an interested party" that meets the definition of "protest" in 31 U.S.C. § 3551.

§ 1491(b)(1) must be construed to permit a cause of action which is neither a "protest" of a solicitation, nor of a contract award (or proposed award).[34]

The question, then, is what is the nature of Plaintiffs' Rule of Two claims in this case?  Does an alleged violation of the Rule of Two challenge a solicitation or otherwise object to an award or proposed award of a contract (*i.e.*, are Plaintiffs' claims "protests")?  Or, are Plaintiffs' claims properly considered only under the fourth prong of § 1491(b)(1)?

Before answering those questions, the Court returns to the statutory language of the FASA task order protest bar, and concludes that it applies, by its plain terms, only to the first three causes of action identified in § 1491(b)(1), where CICA's definition of "protest" and the Tucker Act overlap.[35]  In that regard, this Court concludes that the *in*

---

[34] As *RAMCOR* confirms, the protest of a "proposed award" concerns the merits of the agency's presumptive award (prior to the actual award), but in any event is *not* the same thing as a solicitation protest. 185 F.3d at 1289 ("[a] challenge on the merits would, for example, amount to an objection to 'a proposed award or the award of a contract'"); *see also, e.g., CGI Fed., Inc.*, B-418807, 2020 CPD ¶ 276, 2020 WL 4901733, *4 (Aug. 18, 2020) (holding that although "[u]nder CICA, protests are defined to include challenges involving solicitations, and awards made or proposed under those solicitations[,]" the putative protestors did not allege grounds within the GAO's jurisdiction "because they do not object to the terms of a solicitation and do not otherwise concern the award of a contract"); *Litton Sys., Inc.*, B-229921, 88-1 CPD ¶ 448, 1988 WL 227107, *6 (May 10, 1988) (explaining that GAO "generally see[s] nothing improper in an agency requirement that a *proposed award selection* be reviewed by higher agency officials" (emphasis added)).  A typical "proposed award," for example, is an agency's announcement of its intent to award a sole-source contract.  *See, e.g., Wamore, Inc.*, B-417450, 2019 CPD ¶ 253, 2019 WL 3214259 (July 9, 2019) ("Wamore filed its protest challenging the Army's planned sole-source contract award to Airborne Systems."); *eFedBudget Corp.*, B-298627, 2006 CPD ¶ 159, 2006 WL 3347953 (Nov. 15, 2006) ("eFedBudget Corporation protests the proposed award of a contract on a sole-source basis to RGII Technologies, Inc.").

[35] *Alphapointe v. Dep't of Veterans Affairs*, -- F. Supp. 3d --, 2020 WL 4346914, at *6–*7 (D.D.C. July 29, 2020) (transferring case to the Court of Federal Claims, and rejecting, consistent with other cases, plaintiff's argument that § 1491(b)(1) only covers "a bid protest or 'a dispute over an individual contract solicitation or award.'" (quoting *Pub. Warehousing Co. K.S.C. v. Defense Supply Ctr.*, 489 F. Supp. 2d 30, 39–40 (D.D.C. 2007)).  In *Public Warehousing Co.*, the District Court correctly explained that the notion of a "'bid protest' limitation was squarely rejected in *RAMCOR*" because "[l]imiting the 'violation of statute or regulation' prong to bid protest cases would render it superfluous." 489 F. Supp. 2d at 40 (holding that if "section 1491(b)(1) were limited to claims challenging the merits of a specific solicitation or contract award, the 'violation of statute or regulation' clause would serve no purpose because the other clauses in section 1491(b)(1) vesting jurisdiction in the Court of Federal Claims would suffice" (citing RAMCOR, 185 F.3d at 1289)).  Thus, although the term "bid protest" is generally used to refer to actions brought pursuant to 28 U.S.C. § 1491(b)(1), it more accurately describes only the first three prongs of that statutory section.  489 F.2d at 40 (rejecting plaintiff's contention that "Congress intended the matters described [in § 1491(b)(1)] to be limited to bid protests," and citing cases

*pari materia* canon of statutory interpretation[36] should be applied here such that FASA's usage of the term "protest" must be read as Congress defined the term in CICA.

*First*, the Federal Acquisition Streamlining Act of 1994 expressly incorporated the CICA's definition of "protest."  *See* Pub. L. No. 103-355, 108 Stat. 3243 §§ 1004 ("Task and Delivery Order Contracts"), 1054 ("Task and Delivery Order Contracts"), 1401 ("Protest Defined"), 1438 ("Definition of Protest").  There is no reason to go searching for another definition of "protest" in FASA (or elsewhere) where Congress literally defined the term in context.

*Second*, binding Federal Circuit precedent requires us to apply CICA's definition of "interested party" to § 1491(b), and both "interested party" and "protest" are defined in the very same statutory provision.  *See* 31 U.S.C. § 3551; *see also Am. Fed'n of Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294 (Fed. Cir. 2001).[37]  There is no plausible justification for applying CICA's definition of "interested party" to § 1491(b), while ignoring CICA's definition of "protest" in interpreting a jurisdictional limit on § 1491(b).

*Third*, the current FASA task order protest bar itself provides GAO with "exclusive jurisdiction" over a "protest of an order valued in excess of $10,000,000."  41 U.S.C. § 4106(f)(1)(B) & (F)(2).[38]  The term "protest" in the jurisdictional bar must be read as coterminous with what that term means at the GAO.  Viewed from the other

---

for the proposition that "*every* court to address the 'violation of statute or regulation' clause outside of a traditional bid protest setting—in plaintiff's words, 'some other challenge'—has concluded that the breadth of that clause covers even non-traditional disputes arising from the procurement process as long as the violation is 'in connection with a procurement or a proposed procurement'" (emphasis added).  "Thus, although it is true that litigation under the ADRA traditionally has developed around pre- and post-award bid protests, no inference can be drawn that the ADRA covers only those types of cases."  489 F. Supp. 2d at 41 (footnote omitted).  The Federal Circuit favorably cited *Public Warehousing Co. K.S.C.* in *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).

[36] "Under this canon, courts should interpret statutes with similar language that generally address the same subject matter together, "'as if they were one law.'"  *Strategic Hous. Fin. Corp. of Travis Cty. v. United States*, 608 F.3d 1317, 1330 (Fed. Cir. 2010) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (internal quotes omitted)).

[37] *See also Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (noting that "the term 'interested party' in section 1491(b)(1) is construed in accordance with the [CICA], 31 U.S.C. §§ 3551–56"); *Digital Techs., Inc.*, 89 Fed. Cl. at 722 n.15 ("The United States Court of Appeals for the Federal Circuit has applied the CICA definition of 'interested party' in bid protests . . . ."); *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 377 (2012) (discussing 41 U.S.C. § 4106(f), and CICA's definition of "protest"); *Technatomy Corp.*, B–405130, 2011 WL 2321836, at *4 (June 14, 2011) (employing CICA's definition of protest in GAO's analysis of § 4106(f)).

[38] Or $25 million for DOD procurements.  10 U.S.C. § 2304c(e)(1)(B).

end of the telescope, the word "protest" cannot be read to mean one thing in the task order protest bar, but something else in the jurisdictional grant to the GAO, as both provisions are contained within 41 U.S.C. § 4106(f).  *Henson v. Santander Consumer USA Inc.*, –– U.S. ––, 137 S. Ct. 1718, 1723 (2017) (unanimous decision) (explaining that a court must have a "persuasive reason" to "abandon our usual presumption that 'identical words used in different parts of the same statute' carry 'the same meaning'" (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005))).

With the CICA's definition of "protest" in mind, the Court concludes that the FASA task order protest bar does not preclude Plaintiffs' respective claims that the agency failed to comply with the Rule of Two, particularly to the extent that such an alleged violation may be viewed as distinct from the solicitation cancellation decisions themselves.  Although we recognize that CICA's definition of "protest" includes an objection to "[t]he cancellation of . . . a solicitation[,]" 31 U.S.C. § 3551(1)(B), and thus such a claim (or cause of action) is plausibly within the ambit of FASA's task order protest bar, (1) the Tucker Act does not even authorize that same, independent action *per se*, as demonstrated *supra* (and as the government itself argues),[39] and (2) the government itself attempts to disengage the Rule of Two issue here from the challenged cancellation decisions.

Again, the government does *not* argue that FASA task order protest bar generally precludes Plaintiffs' challenges to the cancellation decisions; indeed, the government's FASA protest bar argument is focused entirely upon Plaintiffs' Rule of Two argument standing alone and makes no mention of the cancelled procurements.  *See* Def. MJAR at 30–31 (arguing for the "broad reach of FASA" such that "a protest of the failure to conduct a rule of two analysis prior to issuing a task order is not a colorable basis to avoid the statutory bar"); Def. Resp. at 11.  The Court is not surprised by the government's approach because the cancellation decisions themselves are far removed from the selection of a replacement acquisition vehicle, and the government no doubt prefers to target something more likely to be considered "in connection with" a task order process.  To repeat: the government does *not* argue that Plaintiffs' challenge to the solicitation cancellations are barred *per se* by FASA.  Thus, the government's strategy, understandably, is to tie the Rule of Two claims directly to the agency's putative selection of a task order vehicle, and then rely upon the breadth of FASA's "in connection with" language to argue for the application of the FASA protest bar.

If the government's view of the Rule of Two claims is correct, however – *i.e.*, that it is segregable from the challenge to the solicitation cancellations as such – that means that Plaintiffs' "action" alleging a violation of various statutory or regulatory provisions does not fit within any of CICA's "protest" categories.  And, thus, this Court properly

---

[39] That is why, pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1), Plaintiffs must ground their case here upon an alleged violation of statute or regulation.

may consider Plaintiffs' Rule of Two claims, as explained above, only under the fourth prong of 28 U.S.C. § 1491(b)(1), just as this Court must for the direct cancellation decision challenge.  Again, the fourth prong of 28 U.S.C. § 1491(b)(1) constitutes an independent cause of action that is best understood as "cover[ing] even non-traditional disputes arising from the procurement process as long as the violation is 'in connection with a procurement or proposed procurement[.]'"  *Validata Chem. Servs. v. Dep't of Energy*, 169 F. Supp. 3d 69, 78 (D.D.C. 2016) (quoting *Pub. Warehousing Co. K.S.C. v. Defense Supply Ctr.*, 489 F. Supp. 2d 30, 40 (D.D.C. 2007) (quoting 28 U.S.C. § 1491(b)(1))).  Again, CICA's definition of protest contains no analog to that prong of § 1491(b)(1).[40]

The Court can demonstrate this conclusion by viewing the problem from yet another, slightly different, angle.  As explained above, the word "protest" cannot mean one thing in the FASA provision precluding this Court's jurisdiction over a particular class of actions, but another thing in conferring exclusive jurisdiction on the GAO for the very same objections (or "protests").  Accordingly, the FASA statutory provision only precludes this Court from hearing actions over which GAO would itself have exclusive jurisdiction were the task order award (or proposed award) valued in excess of $10 million (or $25 million for DOD procurements).  41 U.S.C. § 4106(f)(2); 10 U.S.C. § 2304c(e)(1)(B).  The GAO does not have jurisdiction over *RAMCOR*-type actions brought pursuant to the final prong of 28 U.S.C. § 1491(b)(1),[41] and, thus, to the extent Plaintiffs' respective actions here may be properly considered under that final prong, but not by the GAO under its jurisdictional statute, the FASA task order protest bar cannot apply to preclude them.[42]  That Plaintiffs' allegations *are* properly considered

---

[40] To the extent Plaintiffs object to the solicitation cancellations, our jurisdiction to consider such a challenge is also covered by the fourth prong of 28 U.S.C. § 1491(b)(1), but at least that cause of action fits comfortably within CICA's definition of "protest," although the government does not argue that the FASA bar applies to such an objection here.  31 U.S.C.A. § 3551(1)(B) (solicitation cancellation).  In contrast, a challenge to an agency's selection of a replacement acquisition vehicle as contrary to law, while squarely within 28 U.S.C. § 1491(b)(1), is not covered *per se* by CICA's definition of "protest."

[41] *See Aerosage, LLC*, B-417289, 2019 CPD ¶ 151 n.10 (Apr. 24, 2019) ("A protester desiring to seek enforcement of CICA's stay provisions must request relief from a court of competent jurisdiction-currently the U.S. Court of Federal Claims."); *Aerosage, LLC*, B-415267.13, 2018 CPD ¶ 114, 2018 WL 1392945 n.7 (Mar. 19, 2018) ("our Office has no jurisdiction to consider whether an agency improperly failed to comply with a stay of performance").  A challenge to an agency's override of a CICA automatic stay is not characterized as a "protest."  Any interpretation of the word "protest" in the FASA task order protest bar must come to grips with the fact that *RAMCOR*-type actions are not protests.

[42] Again, even though the CICA's definition of "protest" *does* include a challenge to the "cancellation of . . . a solicitation," 31 U.S.C. § 3551(1)(B), Plaintiffs here do not challenge the cancellation of a solicitation "in connection with the issuance or proposed issuance of a task . . . order" – which language concerns the merits of a task order award (or proposed award), as explained *infra*.  Moreover, § 1491(b)(1) does not even independently identify solicitation

under the final prong of § 1491(b)(1) is a conclusion all but compelled by the Federal Circuit's decision in *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) ("PDS Consultants alleged a statutory violation—namely, that the VA acted in violation of [statute] by awarding contracts without first conducting the Rule of Two analysis. . . . As an 'alleged violation of statute or regulation in connection with a procurement or a proposed procurement,' PDS Consultants' action arises under the Claims Court's jurisdiction."); *see Glob. Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350, 445–49 (2009) (rejecting government's contention that if plaintiff "can overcome the jurisdictional bar simply by alleging that a regulation was violated, then that just eviscerates the jurisdictional bar").

In sum, our point is only that, even assuming the Rule of Two issue may be disconnected entirely from the cancellation challenges themselves, as the government suggests, the FASA task order bar would not apply here because it does not necessarily reach "actions" brought pursuant to the fourth prong of 28 U.S.C. § 1491(b)(1). *Unisys Corp. v. United States*, 90 Fed. Cl. 510, 517 (2009). The Court quotes *Unisys* at length because it is particularly instructive in the context of the instant case:

> This court therefore reviews an agency's compliance with § 3553 "independent of any consideration of the merits of the underlying contract award." *Planetspace Inc. v. United States*, 86 Fed. Cl. 566, 567 (2009). Although "the Comptroller General of the United States" has "exclusive jurisdiction" over protests of task orders valued in excess of $10 million, *this lawsuit does not concern the task order itself*, but merely whether TSA wrongfully failed to comply with 31 U.S.C. § 3553. National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110–181, § 843, 122 Stat. 3, 236 (codified at 10 U.S.C. § 2304c); *see also Digital Techs. v. United States*, No. 08–604C, 2009 WL 4785451 (Fed. Cl. Dec. 9, 2009). This Court thus possesses jurisdiction to review the alleged violation of § 3553.

90 Fed. Cl. at 517 (emphasis added). In terms of the language of § 1491(b)(1), Plaintiffs allege that, in cancelling the solicitations at issue, based primarily upon the agency's

---

cancellations as a separate category of claims, and, thus, any such challenge under the Tucker Act, as amended by ADRA, must rely upon the final prong of § 1491(b)(1) in any event. *Validata Chem. Servs.*, 169 F. Supp. 3d at 84 (explaining that "any arguable parallel between CICA and ADRA breaks down, as explained above, where the plaintiff's cause of action falls under the [final] prong of ADRA's 'objecting to' test, which does not require that the plaintiff object to a federal contract solicitation or award" (citing § 1491(b)(1) and *RAMCOR*, 185 F.3d at 1289)); *Alaska Cent. Exp., Inc. v. United States*, 50 Fed. Cl. 510, 517 (2001) ("The CICA and the ADRA are, after all, different statutes, with different definitions of bid protest.").

intent to use the TMS MAIDIQ, the agency has violated FAR 1.602–2(b), FAR 19.502-2 and FAR 19.502-9 – all  of which are regulations "in connection with a procurement or proposed procurement" under the Tucker Act.  TTGI Am. Compl. at ¶¶ 36–38; PTP Compl. at ¶¶ 98–111; TTGI MJAR at 20–22; PTP MJAR at 21–28.

In any event, neither the terms or parameters of the TMS MAIDIQ itself nor any specific task order solicitation is at issue.  Indeed, at least as of the time of filing of Plaintiffs' respective complaints, there was no pending task order solicitation, let alone a task order award (or proposed award).  TTGI Am. Compl. at ¶ 27; PTP Compl. at ¶ 51.[43]

### 2.    FASA Only Bars Challenges Related To The "Proposed Issuance Or Issuance" Of A Task Order

Further supporting the Court's conclusion that the FASA bar does not apply to Plaintiffs' Rule of Two claims is the fact that the FASA task order protest bar – again, by its terms – only applies to a "protest . . . in connection with the *issuance or proposed issuance of a task . . . order* . . . ."  41 U.S.C. § 4106(f)(1) (emphasis added).  The latter phrase further limits the scope of the protest bar insofar as it virtually mirrors *only* the second and third prongs of § 1491(b)(1) – *i.e.*, "a proposed award or the award of a contract" – but with FASA replacing the Tucker Act's reference to "award" and "contract" with, respectively, "issuance" and "task order."  As demonstrated, *supra*, however, the second and third prongs of § 1491(b)(1), properly understood, include challenges to the results or merits of a procurement – an award or proposed award of a contract – but do not cover solicitation protests, the latter which is a distinct cause of action under both the Tucker Act, as amended by ADRA, and CICA's definition of "protest."

---

[43] The government, in its response brief, notified this Court that:

> [t]he agency recently issued a request for task order proposals in order to be prepared to proceed with the procurement in the event the Court dismisses plaintiffs' protest of that procurement.  This precautionary step was taken *subsequent to the filing of the complaints in this action*.  However, in accordance with the agency's voluntary stay to October 20, 2020, no awards will be issued.

Def. Resp. at 8 n.2 (emphasis added).  Following a status conference with the parties on November 12, 2020, Minute Order (Nov. 12, 2020), the government agreed to delay the task order proposal deadline until November 30, 2020.  Because this request for proposals was issued following the initiation of this action, this Court's analysis remains limited to the facts as alleged in Plaintiffs' complaints.  *See Walton v. United States*, 80 Fed. Cl. 251, 264 (2008) ("[I]t appears that binding Federal Circuit law has not departed from the established rule that jurisdiction is determined on the basis of the *facts that existed* at the time the complaint was filed." (emphasis added)), *aff'd*, 551 F.3d 1367 (Fed. Cir. 2009).

Accordingly, just as a challenge to a solicitation is distinct from the challenge to a proposed award of contract, so too a challenge to the selection (or planned selection) of a particular (task order) contracting vehicle does not equate to the "proposed issuance" of a task order.  The fact that the agency here has "proposed" to use a MAIDIQ is *not* the same as the "proposed *issuance*" of a task order.[44]  Again, FASA's reference to the "proposed issuance" of a task order mirrors § 1491(b)(1)'s use of "proposed award" – the former does not cover an agency's "proposed issuance" of a task order solicitation any more than the latter includes an agency's mere issuance of a standard solicitation.

A close reading of FASA's task order protest bar thus suggests that it is inapplicable even to a claim explicitly challenging an agency's selection of a task order vehicle for a procurement, assuming that is one way to characterize Plaintiffs claims in this case.  To be clear, however, Plaintiffs here challenge neither the terms of a solicitation, the issuance of a task order solicitation, nor the award (or proposed award) of a task order.  *Validata Chem. Servs.*, 169 F. Supp. 3d at 78 (explaining that where plaintiff "is not objecting 'to a [government] solicitation,' 'to a proposed award,' or to an actual 'award of a [government] contract,' . . . neither the first nor the second prong of

---

[44] *See supra* n. 36.  It bears repeating that if a "proposed award" were interpreted to cover the same cause of action as a challenge to a solicitation, the first prong of the § 1491(b)(1) would be rendered meaningless, just as the Federal Circuit in *RAMCOR* explained with respect to the "violation of a statute or regulation in connection with a procurement or a proposed procurement" language.  *RAMCOR*, 185 F.3d at 1289; *Jacobs Tech. Inc.*, 100 Fed. Cl. at 175 (critiquing the "conflat[ion] [of] the separate jurisdiction grounds of solicitation, proposed award or award, on the one hand, and violation of a statute or regulation, on the other"); *Nat'l Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281, 288–89 (2016) (noting that the Court "must address whether the protestor is objecting to a solicitation, proposed award, award, or violation of law 'in connection with a procurement or a proposed procurement'" – all distinct categories).  While this Court has often grouped the first two prongs of § 1491(b)(1) into pre- or post-award protest categories, as noted *supra*, the statute clearly distinguishes between an action that is an objection to a solicitation and one that constitutes a challenge to a proposed award of a contract.  *Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 482 (2006) (explaining that "[t]he statute's use of the conjunction 'or' makes it clear that the Court has jurisdiction over each of the . . . identified types of actions" and citing *RAMCOR*, 185 F.3d at 1289, for the proposition that the "violation of statute or regulation prong" of 28 U.S.C. § 1491(b)(1) provides a grant of jurisdiction separate and apart from "an objection to 'a proposed award or the award of a contract'").  Indeed, *Advanced Sys. Tech.* specifically referenced "[t]he plain language of the first prong of 1491(b)(1)" as "provid[ing] that this Court has jurisdiction over 'an action brought by an interested party objecting to a solicitation[.]'"  *Id.; see also DMS All–Star Joint Venture v. United States*, 90 Fed. Cl. 653, 661 n.10 (2010) (noting the protestor challenged not the terms of the solicitation but the proposed award to a particular offeror).  The Federal Circuit similarly has distinguished between the different categories of § 1491(b)(1) *protest*-type actions.  *Res. Conservation Grp.*, 597 F.3d at 1245 (referencing "a challenge to an award, proposed award, or solicitation").

ADRA's 'objecting to' test is implicated").  Instead, Plaintiffs' focus is on the agency's allegedly improper cancellation of two completed procurements.

As explained above, Plaintiffs allege that the agency's decision to cancel those solicitations fails the APA standard of review, at least in part because the agency erred in concluding that it could utilize the TMS MAIDIQ vehicle to procure the work at issue.  In turn, whether the agency correctly (or incorrectly) reached *that* latter conclusion depends at least in-part on whether the agency complied with the Rule of Two.  But whether this Court addresses the Rule of Two question simply as a subsidiary issue in deciding the propriety of the agency's cancellation decisions or whether we view Plaintiffs' Rule of Two claim as a stand-alone allegation of a regulatory violation, as explained *supra*, the action in either case is not a "*protest . . . in connection with the issuance or proposed issuance of a task . . . order*[.]"  41 U.S.C. § 4106(f)(1) (emphasis added).  Again, Plaintiffs' action here properly is considered pursuant to the last prong of § 1491(b)(1) – an alleged "violation of a statute or regulation in connection with a procurement or a proposed procurement."  *Acetris Health, LLC v. United States*, 949 F.3d 719, 728 (Fed. Cir. 2020) ("The reference to 'proposed procurements' likewise broadly encompasses all contemplated future procurements by the agency.").  Put yet differently, while all "proposed" awards of either contracts or task orders may be subsumed within the "in connection with a procurement" language, not all alleged violations of a statute or regulation "in connection with a procurement or proposed procurement" involve an award or a proposed award.[45]  Any contrary interpretation would read a statutory phrase out of existence.

---

[45] Indeed, the phrase "proposed award" in 28 U.S.C. § 1491(b)(1) appears to be a term of art employed due to this Court's prior, more limited, pre-ADRA jurisdiction over "bid protests" pursuant to § 1491(a).  Prior to ADRA, this Court had jurisdiction to consider implied contract claims exclusively from "disappointed bidders" but could only order injunctive relief in *pre*-award cases.  That meant there was no jurisdiction over solicitation challenges brought prior to the submission of proposals because such a plaintiff could not be a "disappointed bidder" – no implied contract to fairly consider a proposal would yet exist.  And, once an award was actually made, a plaintiff might be a "disappointed bidder" but could not obtain injunctive relief.  For a "proposed award," however, a plaintiff could file a bid protest claim pursuant to § 1491(a) *and* obtain injunctive relief.  The critical point here is that the phrase "proposed award" – whether in 28 U.S.C. § 1491 or in FASA – is not intended to cover some future result of a solicitation that has not been issued or even the future result of an ongoing procurement process, in general.  *See, e.g.*, *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983) ("Thus [§ 1491](a)(3) made an equitable remedy available when a claim over which the court has jurisdiction (implied contract under (a)(1)) is filed in the court before a contract has been awarded."); *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995) (pre-ADRA § 1491(a) "jurisdictional grant . . . extends to suits brought by *disappointed bidders*, commonly called bid protests, challenging the *proposed award* of contracts based on alleged improprieties in the procurement process" (emphasis added)).  "Proposed award" was never understood, pre-ADRA, to encompass pre-solicitation agency decisions or even solicitation challenges for the simple reason that "[v]iolations of law, rule, or regulation in the structuring

The government's interpretive approach would rewrite the FASA task order protest bar as applying "in connection with a task order" generally or "in connection with a task order procurement or proposed procurement."  Congress' selection of the phrase "*issuance or proposed issuance,*" however, must be given meaning.  In sum, while the phrase "in connection with" must be interpreted broadly per the directions of the Federal Circuit, the Court concludes that the neighboring language in 41 U.S.C. § 4106(f)(1) – the phrases "protest" and "issuance or proposed issuance of a task . . . order" – serve to limit the reach of the FASA task order protest bar.[46]

### 3.     The Failure To Conduct A "Rule Of Two" Analysis Challenge Is Not "In Connection With" A Task Order

Finally, while the Federal Circuit often has recognized that the phrase "in connection with" should be interpreted broadly, this Court recognizes that the Supreme Court has cautioned that "a non-hyperliteral reading [of this term] is needed to prevent the statute from assuming near-infinite breadth."  *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760, 774 (2016); *see Maracich*, 570 U.S. at 59–60 (citing cases).  Although the government relies upon *SRA Int'l, Inc. v. United States*, 766 F.3d 1409 (Fed. Cir. 2014), Def. Mot. at 30–31, that case is distinguishable in a manner that supports jurisdiction here (even putting aside this Court's foregoing analysis of the other parts of the FASA statutory language).  In *SRA Int'l*, the protestor appealed this Court's dismissal of a protest, which alleged that the agency improperly had waived a conflict of interest *following the award of a task order*.  *Id.* at 1410.  This Court held the waiver was not in connection with the task order because the waiver was issued after the award and was "a matter left to agency discretion."  *Id.* at 1412 (quoting *SRA Int'l, Inc. v. United States*, 114 Fed. Cl. 247, 255–56 (2014)).  The Federal Circuit reversed, holding that neither the

---

of a solicitation . . . are breaches of statutory or regulatory obligations, not contractual ones, and this court does not have the authority to redress them either in law or equity through a *disappointed bidder* suit."  *Eagle Const. Corp. v. United States*, 4 Cl. Ct. 470, 476–77 (1984) (emphasis added) (explaining that pursuant to pre-ADRA § 1491(a) jurisdiction, "the court's jurisdiction over the implied contract of fair dealing in disappointed bidder cases embraces neither claims challenging terms, conditions, or requirements of solicitations, nor policies and activities which preceded and resulted in the solicitations").  On the other hand, where offerors had submitted bids or proposals, "Congress intended 28 U.S.C. § 1491(a)(3) to [provide] . . . an *unsuccessful bidder* [with] standing to challenge a *proposed contract award* on the ground that *in awarding the contract* the government violated statutory and procedural requirements."  *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1574 (Fed. Cir. 1983) (emphasis added).  In this case, there is no "proposed award" at issue.

[46] *Glob. Computer Enterprises, Inc.*, 88 Fed. Cl. at 414–15  ("If Congress intended to prohibit protests stemming from any action *related to a task order contract*, then it could have explicitly drafted a statute that barred any protest *in connection with a task order*.  It did not do so.  Instead, Congress prohibited bid protests *in connection with* either the *issuance or proposed issuance* of a task order. . . ." (emphasis added)).

temporal disconnect between the task order and the waiver, nor the latter's discretionary nature, adequately separated the protest from the underlying task order. 766 F.3d at 1413. Thus, in *SRA Int'l*, the Federal Circuit concluded that an "OCI waiver was *directly and causally* connected to the issuance of [a task order], despite being executed after issuance." 766 F.3d at 1413 (emphasis added). Indeed, "[t]he GSA issued the waiver in order to go forward with [the selected awardee]." *Id.* Substitute "solicitation cancellation" for "OCI waiver," and the government's position here – at least on the surface – would seem to be correct.

Critically, however, the Federal Circuit cautioned that while "nothing in FASA's language *automatically exempts* actions that are temporally disconnected from the issuance of a task order[,] . . . *a temporal disconnect may, in some circumstances, help to support the non-application of the FASA bar* . . . ." 766 F.3d at 1413 (emphases added). In this case, as previously explained, Plaintiffs' respective complaints may be read as contending that the agency's failure to follow the Rule of Two (1) renders the solicitation cancellations arbitrary and capricious, and/or (2) independently violated FAR 19.502-2(b). Either way, for the reasons explained further below, the Rule of Two issue in the instant case is both conceptually and sufficiently "temporally disconnected from the issuance of a task order" to avoid it. *Id.*

Plaintiffs essentially contend that an agency must apply the Rule of Two *before* an agency can even identify the possible universe of procurement vehicles which may be utilized for a particular scope of work. TTGI Am. Compl. at ¶ 36; PTP Compl. at ¶¶ 95, 111; TTGI MJAR at 26; PTP MJAR at 25–27. The Court agrees. Where an agency refuses to perform the Rule of Two analysis or otherwise disregards the results of such an analysis, that does not mean an agency necessarily *will* select an unrestricted vehicle or as task order vehicle. Indeed, the agency still may solicit the work utilizing procurement vehicles that have nothing to do with task orders (*e.g.,* a standalone solicitation contemplating a single awardee but that is not set-aside for small business). In other words, there is no necessary connection between the Rule of Two analysis (or the failure to conduct such an analysis) and the issuance of a task order. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 680 (2016) ("Necessarily, the decision to set aside an acquisition for a small business must be made prior to issuing the solicitation." (citing FAR 19.508)). In contrast, in *SRA Int'l*, the agency simply could not proceed with a task order that the agency *already had awarded*, absent the challenged conflict waiver. The conflict waiver thus was necessary to the actual task order award (and the plaintiff had challenged a specific task order award).

To further illustrate the distinction, consider a hypothetical case in which an agency purports to have applied the Rule of Two. As a result of the agency's analysis, the agency determines that a set-aside is not required. Instead of immediately proceeding with a particular procurement strategy, however, the agency issues a request for information ("RFI"), in which the agency indicates that it is considering various unrestricted vehicles with no set-aside component: *e.g.*, a stand-alone, new

solicitation with a single-awardee; an existing MAIDIQ; or the issuance of a new MAIDIQ.  At that stage, following the issuance of the RFI, may a dissatisfied small business file suit in the Court of Federal Claims, pursuant to 28 U.S.C. §1491(b)(1), challenging the agency's decision not to set-aside the procurement?  In the Court's view, the answer to that question is a straightforward "yes" based upon a simple syllogism:  (1) the RFI is part of the procurement process; (2) the RFI includes the agency's decision not to set-aside the procurement; (3) a small business protestor's allegation that the agency's decision violates the Rule of Two constitutes an alleged "violation of statute or regulation in connection with a procurement or a proposed procurement"; and, thus, (4) the allegation is unquestionably within this Court's jurisdiction.  *Distributed Sols., Inc.*, 539 F.3d at 1346 ("The statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'  A proposed procurement, like a procurement, begins with the process for determining a need for property or services.").

In the hypothetical case outlined above, the FASA task order protest bar clearly would *not* apply because, *at a minimum*,[47] the agency has not yet selected any contract vehicle (task order or otherwise).  Moreover, if the small business were to file suit in this Court, the government could not subsequently divest this Court of jurisdiction merely by selecting an IDIQ vehicle.  *See GAF Bldg. Material Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed. Cir. 1996) ("[J]urisdiction must be determined on the facts existing at the time the complaint under consideration was filed.")  Nor, for that matter, should jurisdiction depend upon whether the small business beats the agency to the punch, and files suit to challenge the set-aside analysis, or whether the agency quickly makes a decision to utilize a task order vehicle prior to the filing of a suit.  In both cases, the agency's Rule of Two decision simply has no necessary connection to the selection of the particular vehicle.[48]  *See McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 709–10 (2013) (holding that

---

[47] Pursuant to the Court's interpretation of the FASA task order protest bar, *supra*, an objection to an agency's selection of a task order vehicle is not, in any event, a "protest . . . in connection with the issuance or proposed issuance of a task . . . order[.]"  41 U.S.C. § 4106(f)(1).  The Court's point here is that, even if our statutory interpretation were rejected, *SRA Int'l* is consistent with "the non-application of the FASA bar" in this case.  766 F.3d at 1413.

[48] Again, this assumes, *arguendo*, that the challenge to an agency's selection of a task order vehicle itself would be within the ambit of the FASA task order protest bar, a proposition with which the Court disagrees.  In any event, the Court's view of the correct result in the hypothetical fits well with the Court's interpretation of the FASA statutory language.  In particular, a challenge to an agency's failure to comply with the Rule of Two is not a "protest" as that term is defined in CICA.  In this case, for example, it is a challenge neither to a particular solicitation nor to the merits of an award or to a proposed award of a task order.  Similarly, in the Court's hypothetical case involving the RFI, the small business would be challenging the agency's decision not to set-aside the procurement, but would *not* be objecting to the agency's decision to proceed with any particular procurement strategy because none has been selected.

"McAfee's complaint falls under the [final] prong of Section 1491(b)(1), concerning an alleged 'violation of statute or regulation in connection with a procurement or a proposed procurement'" and that "the protested decision is not directly connected to the award of any particular delivery order"); *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 499, 507–08 (2012) (holding that the FASA jurisdictional bar did not apply to the agency's decision to cancel a solicitation, and that although the cancellation of the solicitation and issuance of the task order were temporally connected, the cancellation of the solicitation can be viewed as "a discrete procurement decision and thus could have been the subject of a separate protest"); *cf. MORI Assocs., Inc. v. United States*, 113 Fed. Cl. 33, 38 (2013) (citing the Court's earlier decision in *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 533 (2011), for the proposition that "[d]iscrete, preliminary matters that may not necessarily lead to the proposed issuance of a task order may still be protested" such as "a 'Rule of Two' determination under 48 C.F.R. § 19.502–2(b)" which is "required prior to the selection of a particular procurement vehicle, since whether the work must be set aside for small business must be known before an agency can select the means of fulfilling its needs").[49]

---

The actual Plaintiffs in this case are similarly situated to the hypothetical small business; their complaint may be read as challenging the agency's solicitation cancellation decision and its refusal to set aside the work at issue, but not the decision to use a task order contact *per se*. In contrast, in *SRA Int'l*, the protestor had filed a post-award bid protest, challenging the issuance of a task order on the grounds of a conflict (and an improper waiver) – that clearly *is* a "protest" that is "directly and causally connected" to the issuance of a task order in way that a challenge to a Rule of Two violation is not.

[49] *But cf. Insap Servs., Inc. v. United States*, 145 Fed. Cl. 653, 654 (2019). In that case, Judge Wheeler rejected plaintiff's argument "that this Court has jurisdiction to hear its protest because it is challenging the conditions antecedent to the solicitation, not the solicitation itself" and because "the decision to bundle [certain] services under a single solicitation is not connected to the solicitation, as it occurs 'prior to' and is not 'mutually dependent on' the issuance of the task order." *Id. Insap* is distinguishable insofar as it involved a challenge to a bundling decision where a "Request for Task Order Proposals" *already* had been issued at the time of the protest. *Id.* In any event, the undersigned admittedly does not share *Insap*'s capacious view of the Federal Circuit's decision in *SRA Int'l*, particularly to the extent *Insap* relied upon "[p]olicy considerations[,]" including the assessment that this Court should not "allow a protest to be heard at this Court after already being heard by GAO" as that "would burden the Government and negate Congress's intent to streamline." *Id.* at 655. Although *Insap* concluded that "[i]t would defeat Congress's purpose if would-be protestors could make an end run around the FASA's plain meaning by claiming that they are challenging the conditions of the solicitation, but not the task order itself[,]" *id.*, this Court disagrees with such an interpretation of the FASA task order protest bar for the reasons explained herein. *See BayFirst Sols.*, 104 Fed. Cl. at 507–08 ("The cancellation of the Solicitation may be viewed as a discrete procurement decision and one which could have been the subject of a separate protest. This approach is not unlike the one employed by the court in *MORI*, where a preliminary procurement decision, one which should have occurred before any contract vehicle was selected, was held to be subject to challenge and

Finally, at least one GAO decision supports the Court's view of the jurisdictional question and the FASA task order protest bar.  In *LBM, Inc.*, the protestor challenged the Army's decision to acquire certain services under the Logistical Joint Administrative Management Support Services ("LOGJAMSS") contracts, when those services previously had been provided exclusively by small businesses.  B-290682, 2002 CPD ¶ 157, 2002 WL 31086989, *1.  After the Army decided to transfer the services at issue to the LOGJAMSS contracts, the agency solicited proposals from LOGJAMSS contractors, but "did not coordinate with, or notify, the SBA of its intent to withdraw ... services from exclusive small business competition and to transfer these services to LOGJAMSS contracts."  *Id.* at *3.  The GAO sustained the protest.  *Id.* at *8.  In so doing, the GAO rejected the Army's contention that the FASA task order protest bar divested the GAO of jurisdiction because the protestor challenged the proposed issuance of a task order under the LOGJAMSS contract; the GAO explained as follows:

> LBM is not challenging the proposed issuance of a task order for these services, but is raising the question of whether work that had been previously set aside exclusively for small businesses could be transferred to LOGJAMSS.... This is a challenge to the terms of the underlying LOGJAMSS solicitation and is within our bid protest jurisdiction.

*Id.* at *3.[50]  The GAO further held that the FASA "was not intended to, and does not, preclude protests that timely challenge the transfer and inclusion of work in ID/IQ contracts without complying with applicable laws or regulations," *id.*, and explained that Small Business Act requirements "were applicable to acquisitions prior to the enactment of [the] FASA, and nothing in that statute authorizes the transfer of acquisitions to ID/IQ contracts in violation of those laws and regulations," *id.* at *4.  The GAO indicated that the "Rule of Two" applied "to 'any acquisition over $100,000,'" *id.* at *7 (quoting 48 C.F.R. § 19.502–2(b)), and therefore determined that the Army was required to comply with FAR § 19.502–2(b) and conduct the appropriate "Rule of Two" analysis.  *Id.* ("Whatever the outcome of the FAR § 19.502–2(b) analysis, ... the agency's intent to use a task order under LOGJAMSS as the contract vehicle did not eliminate the legal requirement that the agency undertake that analysis.").

---

not barred by § 4106(f), even though the agency eventually issued a task order to fulfill its needs. 102 Fed. Cl. at 533–34.")  And, again, in any event, Plaintiffs in this case do not challenge the conditions of any solicitation.

[50] To be clear, although this Court agrees with the GAO's view of the scope of task order bar as applied (or, more accurately, not applied) in *LBM*, the Court does *not* concur with the GAO's view that a challenge to the agency's selection of an IDIQ task order contract vehicle constitutes a solicitation protest.

Accordingly, in *LBM, Inc.*, the GAO declined to apply the FASA task order protest bar even where the protestor directly challenged the agency's selection of a task order vehicle and *after* the agency had issued a task order solicitation under that vehicle – the latter which, the Court again notes, had not occurred in this case at the time Plaintiffs filed their respective complaints.  Apparently, then, the GAO's view of the FASA task order protest bar is consistent with this Court's reasoning, *supra*, that even an objection to a solicitation – a "protest" within the GAO's jurisdiction – does *not* equate to a protest "in connection with" the proposed issuance of a task order.  *See Glob. Computer Enter., Inc.*, 88 Fed. Cl. at 448 ("Although the protest in *LBM, Inc.* concerned the underlying contracts . . ., the court nevertheless finds it instructive" because the protestor "did not challenge the issuance or proposed issuance of a task order under the existing contract.").

\* \* \* \*

In sum, this Court holds that the FASA task order protest bar is not an obstacle to considering Plaintiffs' challenge to the cancellation of a solicitation, even where this Court will have to reach the merits of their Rule of Two claims – whether because the rationality of the agency's cancellation depends upon the availability of the preferred MAIDIQ vehicle, or because the alleged failure to conduct a Rule of Two analysis constitutes an independent basis for our jurisdiction pursuant to the last prong of § 1491(b)(1).

## III.    Standards of Review

### A.    Motion For Judgment On The Administrative Record

Judgment on the Administrative Record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record."  *Id.* at 1354.  The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *See id.* at 1356–57.

### B.    Challenge To Cancellation Decision

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706."  *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) (citing 28 U.S.C. § 1491(b)(4)).  "In applying this standard of review, we determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of

41

regulation or procedure.'"  *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).  "When a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Impresa Construzioni*, 238 F.3d at 1333.  To establish prejudice, a protestor must further demonstrate "that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."  *Bannum, Inc.*, 404 F.3d at 1357 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)); *see Kiewit Infrastructure West Co. v. United States*, 147 Fed. Cl. 700, 707 (2020) (requiring a showing of prejudice in challenge to cancellation decision).

In some cases, a statute or regulation may provide a substantive yardstick against which an agency's exercise of discretion may be measured or impose a related procedural requirement.  For example, as noted above, in the context of a sealed bid procurement, FAR 14.404-1 ("Cancellation of invitations after opening") provides that "after bids have been opened, *award must be made* to that responsible bidder who submitted the lowest responsive bid, *unless there is a compelling reason* to reject all bids and cancel the invitation."  FAR 14.404-1(a)(1) (emphasis added).  The FAR further defines what constitutes a "compelling reason" in FAR 14.404-1(c) and imposes a procedural requirement that "the agency head determine[] in writing" that such a reason exists.  *See, e.g.*, *Veterans Contracting Grp.*, 920 F.3d at 806–07 (framing the issue as "whether the contracting officer's decision to cancel the . . . solicitation lacked any rational basis," citing *Parcel 49C Ltd. P'ship*, 31 F.3d 1153–54, for the proposition that "the government cannot cancel a solicitation solely to satisfy an agency's whim, we held that the cancellation was arbitrary and capricious[,]" and holding that the contracting officer "had a compelling reason to request cancellation"); *Nat'l Forge Co. v. United States*, 779 F.2d 665, 668 (Fed. Cir. 1985) (explaining, in a pre-ADRA case, that "[t]he Claims Court correctly restricted its legal review to whether the contracting officer's interpretation of, and later decision to cancel, the solicitation was unreasonable or an abuse of discretion under the requirements for cancellation set forth in 48 C.F.R. § 14.404–1(c)").

Here, the 13F and JFOC Solicitations were issued as FAR Part 8, FSS procurements, which, as the government correctly notes, Def. Supp. Br. at 1–5, do not contain any provisions providing substantive considerations for, or constraints on,

cancellation decisions, similar to those contained in FAR 14.404-1 regarding sealed bidding.

While the government in its initial briefs conceded that the agency's cancellation decision nevertheless should be reviewed pursuant to the standard APA rational basis test, Def. MJAR at 15–17, 25; Def. Resp. at 1, 5, the government takes the position in its supplemental brief that the agency action should only be reviewed for "bad faith" because the procurements were solicited pursuant to FAR Part 8, which does not contain any substantive yardstick for limiting an agency decision to cancel a procurement.  Def. Supp. Br. at 9-10.  While a finding of bad faith may be sufficient, it is not necessary for the Court to determine that an agency decision is arbitrary and capricious.  *Croman Corp. v. United States*, 724 F.3d 1357, 1365 (Fed. Cir. 2013) (holding that "Croman has failed to show that the partial cancellation of the 2011 Solicitation was in bad faith *or lacking in rational basis*" (emphasis added)); *see also Prineville Sawmill Co.*, , 859 F.2d at 911.  In this case, even though FAR Part 8 does not specify substantive cancellation considerations, the Tucker Act, as amended by ADRA, "explicitly imports the APA standard of review into the Court of Federal Claims' review of agency [procurement-related] decisions."  *RAMCOR*, 185 F.3d at 1290; *cf. Strategic Tech. Inst., Inc.*, B-408005.2, 2013 CPD ¶ 229, 2013 WL 5754966, *3 (Oct. 21, 2013) ("Under FAR subpart 8.4 procedures, an agency need only advance a reasonable basis to cancel a solicitation.").[51]  Moreover, as explained above, *see supra* Section II, FAR 1.602–2(b) permits this Court to conduct an APA review, while 10 U.S.C. § 2305(b)(2) supplies a procedural requirement and a substantive yardstick, against which we may evaluate the agency's decisions here.

## IV.   The Court Grants Plaintiffs' Motion For Judgment On The Administrative Record And Denies The Government's Cross-Motion For Judgment On The Administrative Record

Plaintiffs' motions for judgment on the Administrative Record present two primary arguments:  (1) the agency acted in an irrational and unreasonable manner when it cancelled the 13F and JFOC Solicitations due, in part, to the agency's plan to resolicit the requirements under the TMS MAIDIQ; and (2) the agency violated the "Rule of Two" (*see* FAR 19.502-2(b)) and FAR 19.502-9 when cancelling the solicitations for the purpose of recompeting the requirements under the TMS MAIDIQ.  *See* TTGI MJAR at 13–22; PTP MJAR at 21–24.  The government, in its cross-motion for judgment on the Administrative Record, contends that (1) the agency decision to cancel the 13F

---

[51] TTGI counters that because the cancellation decision arose in the context of a corrective action, the Court should apply a more demanding review to determine whether the corrective action was "'rationally related' to an *alleged procurement defect*."  TTGI MJAR at 13–14 (emphasis added) (citing *Dell Fed Sys., L.P. v. United States*, 906 F.3d 982, 955 (Fed. Cir. 2018)).  In either event, whether the cancellation decision is reviewed on its own merits or as part of corrective action, this Court ultimately reviews the agency's decision for "reasonableness."

and JFOC Solicitations for the purpose of transferring the procurements to the TMS MAIDIQ was rational, and (2) the "Rule of Two" does not apply to the facts of this case. ECF No. 30 at 17.

For the reasons explained below, the Court agrees with Plaintiffs.

### A.   The Agency Failed To Provide A Sufficiently Reasonable Explanation For The Cancellation Of The Solicitations

In determining whether the agency adequately explained the reasoning behind its decision to cancel the 13F and JFOC Solicitations, we turn to the explanation provided by the agency at the time of its decision-making. *See WHR Group, Inc. v. United States*, 115 Fed. Cl. 386, 399 (2014) (noting that the agency decision must be supported by the reasoned basis the agency actually provided).  The Court notes that in this case there is no formal cancellation decision or memorandum regarding the 13F and JFOC Solicitations; rather, the only document that proports to show the agency's rationale behind its decision to cancel those solicitations is CO Abraham's August 10 MFR.  ECF No. 25 at 617–20 (AR 613–16).  In that four-page memorandum, CO Abraham describes the GSA MAS solicitation's requirements and history at length, and outlined the features of the TMS MAIDIQ that the agency could use as a replacement.  *Id.*  In discussing the previous solicitations, the memo explained:

> After extensive use of the GSA OASIS MAIDIQ and GSA Multiple Award Schedule, *it was determined the contract vehicles did not meet FCoE mission needs as world events unfolded.* Events included emerging worldwide requirements due to short notice missions, [Training Resource Arbitration Panels] requirements, and lack of capability to provide the subject matter expertise. . . .   As conveyed above, GSA OASIS MAIDIQs and Multiple Award Schedules did not provide the support required by FCoE to support emerging and known requirements."

*Id.* at 617–18 (AR 613–14) (emphasis added).  But, concluding that the prior MAIDIQ and GSA MAS vehicles were not sufficient for the entire breadth of work contemplated by the new TMS MAIDIQ is not the same thing as concluding that the latter vehicle is somehow superior to the GSA MAS vehicles *for the purposes of the statements of work at issue*.  In that regard, following additional historical details about the awarding of the GSA MAS, the August 10 MFR concluded with what is the only excerpt of any agency memoranda in the Administrative Record that reasonably might be characterized as representing the agency's rationale for planning to cancel the 13F and JFOC Solicitations:

> Based on the above information, I believe the Government's best interest *can be met* by competing the JFO, 13F and KMS requirements under the MICC-Fort Eustis recently awarded TMS MAIDIQ. Both time and money can be saved by the Government in pursuit of this avenue. Time and money are expended on soliciting and awarding interim short term contract actions to support on-going requirements. Contract periods can be adjusted to support a Base and Four Option periods on most requirements thus saving manpower and costs tied to phase-in and certification of new contractor employees. Longer periods of performance also support the Government's ability to successfully recruit and retain qualified personnel on existing requirements, thereby ensuring continuity of the training mission.

*Id.* at 620 (AR 616) (emphasis added).

In sum, the agency justified the cancellation on the basis of the assertion that by transitioning the procurements at issue to the TMS MAIDIQ, the agency would get a more flexible and longer term of performance while saving time and money. This explanation, however, without more information – and in the absence of any supporting citations in the underlying record – does not satisfy the agency's burden. Although the Court is mindful that the APA rational basis standard of review is "highly deferential" and "the court should not substitute its judgment for that of the agency," *CW Government Travel, Inc. v. United States*, 110 Fed. Cl. 462, 479 (2013), that "does not mean that this [Court's] review is 'toothless.'" *Orchard Hill Bldg. Co. v. United States Army Corps of Engineers*, 893 F.3d 1017, 1024 (7th Cir. 2018) (quoting *Pioneer Trail Wind Farm, LLC v. FERC*, 798 F.3d 603, 608 (7th Cir. 2015)). More specifically, courts are authorized to set aside agency action where the record fails to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see Starry Assoc., Inc. v. United States*, 127 Fed. Cl. 539, 548–49 (2016) ("Where the agency fails to undertake a review or fails to document such review, we must conclude that it acted irrationally.").

Here, the August 10 MFR is bereft of any specific context or factual details that would support its generalized assertions and naked conclusions about the GSA MAS solicitations not meeting agency needs or how the agency would be better served by transferring the solicitations from the GSA MAS to the TMS MAIDIQ. *See, e.g.*, *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) ("[T]he dispute here arises from a problem that has become all too common among administrative decisions challenged in court – a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math class: Show your work."); *Highway J Citizens Grp., U.A. v. Dep't of Trans.*, 2010 WL 1170572, at *2 (E.D. Wis. Mar. 23, 2010) ("Defendants cannot simply list cursory comments or other

information and then assert a conclusion; rather, they must demonstrate the path of their reasoning from whatever data they rely on to their conclusion . . . .").

Take, for example, the August 10 MFR's first assertion as to the inefficiency of the GSA MAS to meet the agency's needs "as world events unfolded." ECF No. 25 at 617 (AR 613). While this conceivably could be a legitimate concern with the GSA MAS solicitations justifying cancellation,[52] without factual support for this contention, this Court cannot evaluate whether there is a rational basis for the assertion. *See Kirwa v. Dep't of Defense*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) ("APA review may be limited, but it involves more than a court rubberstamping action based on bare declarations from the agency amounting to "trust us, we had good . . . reasons for what we did."). Again, even if the GSA MAS *generally* is insufficient to meet the agency's needs in some long-term, strategic sense – as compared to the breadth of the new TMS MAIDIQ – that says nothing about the suitability of the GSA MAS to meet the agency's current needs with respect to the 13F and JFOC procurements at issue.

Moreover, consider the August 10 MFR's naked assertion that "time and money can be saved by the Government in pursuit of this avenue." ECF No. 25 at 620 (AR 616). If the Court were to accept this rationale at face value without asking for supporting details, the government could always include this attractive catch-all at the end of its decision document to justify almost any solicitation cancellation. Meaningful judicial review requires more than just accepting such a bald assertion. *See Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996) ("The statement of reason need not include detailed findings of fact but must inform the court and the petitioner of the grounds of decision and the essential *facts* upon which the administrative decision was based." (emphasis added)). In this case, the agency does not explain how the TMS MAIDIQ will save the agency "time and money" in comparison with finalizing procurements that were all but completed, nor is there any support in the record for that conclusion beyond the statement itself.

The government, in its cross-motion for judgment on the Administrative Record, argues that the "supporting materials to the August 10 memorandum documented multiple benefits that the TMS MAIDIQ was designed to provide" and "the fact that the current acquisition strategy did not provide those benefits." Def. MJAR at 12, 22. But those putative "benefits" reflect the long-term strategic advantages of the TMS MAIDIQ overall; the government cannot simply point to its general justification for that MAIDIQ, without more, to support the proposition that it will better meet the agency's needs with respect to the precise statements of work at issue. Moreover, although the agency asserts that the TMS MAIDIQ will provide a longer period of performance than

---

[52] *See, e.g., Tien Walker*, B-414623.2, 2017 CPD ¶ 218, 2017 WL 2954445, *2 (July 10, 2017) ("A reasonable basis to cancel exists when, for example, an agency concludes that a solicitation does not accurately reflect its needs.")

the present "short term contract actions," ECF No. 25 at 620 (AR 616), nowhere does the agency address the possibility of extending the duration of those contracts beyond the originally planned 12-month period of performance or why that would be more difficult than utilizing the TMS MAIDIQ.

The government also points the Court to the following examples of the agency's "key finding[s]":

- The agency "necessitates the use of an IDIQ to meet contract execution in a timely manner due to MICC staffing shortfalls."

- "Using other contract mechanism as opposed to a FCoE IDIQ will add a minimum of 120 days to the procurement timeline, potentially eliminate the ability for an expedited contract action for unforecasted organizational needs, and put existing requirements at increased risk for gaps on contracted services."

- "Costs for the use of non-IDIQ contract mechanism will increase significantly."

- "FCoE's ability to support short term, emerging training requirements to meet Army demands will be greatly reduced."

- "FCoE's ability to rapidly provide training, experimentation, analytic, and simulation support will be reduced. Fires-led experiments and the TRADOC Campaign of Learning will be interrupted and/or degraded."

*Id.* at 12–13, 22–23 (quoting ECF No. 25 at 675 (AR 671)).

These generalized conclusions, however, do little to provide actual *factual* support for the agency's cancellation decisions at issue here. Rather than engaging in a factual contrast between the cancelled procurements at issue and the TMS MAIDIQ, the supporting material's conclusory assertions fail to provide a meaningful factual roadmap for the agency's decision.[53]  For example, although the Court has no basis to

---

[53] The government also asserts that "[a]n additional benefit of the TMS MAIDIQ is that the issues that continued to snag the GSA MAS solicitations and send them into bid protests are eliminated as an issue. . . .  This ensured that the TMS MAIDIQ was not subject to a protest and automatic stay at GAO . . . *and it would also provide some comfort that a protest direct to this Court was not likely . . . .*"  Def. MJAR at 24 (emphasis added, internal citations omitted).  Rather than

question the agency's conclusion that it generally requires a MAIDIQ due to staffing shortfalls, there is zero record evidence indicating that any such shortfall would impact the agency's proceeding with the 13F and JFOC procurements or that moving such work to the TMS MAIDIQ would improve any putative staffing difficulties for the work at issue.  The timeline comparison also is not specific to the already-completed (albeit protested) 13F and JFOC procurements; nowhere in the Administrative Record does it appear that the agency compared the timeline of continuing with those procurements as opposed to starting from scratch under the MAIDIQ.  The agency's concern about increased costs for a non-MAIDIQ procurement seems plausible, in general, but CO Abraham never compares the cost of proceeding with the cancelled procurements, as opposed to starting a new task order procurement under the preferred TMS MAIDIQ.  And the final two conclusions above regarding the ability of the FCoE to support Army needs has nothing whatsoever to do with the 13F and JFOC procurements.  To be clear, CO Abraham does *not* conclude in any way that the proceeding with those procurements would jeopardize the FCoE's mission or abilities.  Rather, the point is that the materials upon which she relies merely demonstrates the agency's general interest in utilizing the TMS MAIDIQ.

Although there is no universal test for what constitutes an agency's failure to provide a sufficient justification for its actions and no one factor is dispositive, *see Sierra Nevada v. United States*, 107 Fed Cl. 735, 751 (2012), a cursory review of relevant caselaw from this Court is illustrative.  *Compare FMS Investment Corp. v. United States*, 139 Fed. Cl. 221, 223–25 (2018) (finding that the Department of Education acted unreasonably when it cancelled solicitation for student loan debt collection services because, in part, the cancellation notice relied on a brief Administrative Record and failed to contain detailed information to support important assertions made in that notice), and *Applied Business Mgmt. Solutions v. United States*, 117 Fed Cl. 589, 605–06 (2014) (holding, in part, that GSA's conclusory assertions about "budgetary concerns" and "need to reduce personnel" failed to provide a rational basis for cancellation decision), *with Inverness Technologies, Inc. v. United States*, 141 Fed. Cl. 243, 248, 251–53 (2019) (emphasizing that Department of Labor's cancellation of solicitation for veterans job transition program

---

"provid[ing] some comfort," this Court is quite troubled by the government's assertion that the agency's decision-making was influenced by a desire to avoid bid protest litigation.  *See* ECF No. 37 at 22-24 ("Hearing Transcript") (raising this concern with the government); *see also California Indus. Facilities Resources, Inc. v. United States*, 100 Fed. Cl. 404, 412 (2011) (holding that government conduct taken to "avoid possible bid protests was arbitrary and capricious").  Notwithstanding the government's troubling assertion, it is a "foundational principle of administrative law" that this Court's role in this context is limited to reviewing "the grounds that the agency invoked when it took the action."  *Oracle America, Inc. v. United States*, 975 F.3d 1279, 1290 (Fed. Cir. 2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Here, the agency in its August 10 MFR does not mention this rationale.  Rather, the first mention of this rationale is in the government's brief in this case.  Def. MJAR at 24.  Accordingly, this rationale does not play a role in this Court's determination that the Army acted unreasonably.

services was reasonable because the agency's memorandum was "comprehensive, well-considered and logical" and "outlined, in chart form, key differences between the solicitation and the new requirements").  Some decisions from the GAO also have found that an agency acts unreasonably when it fails to provide sufficient documentation of its decision-making.  *See, e.g.*, *Walker Development & Trading Grp., Inc.*, B-413924, 2017 CPD ¶ 21, 2017 WL 134346, *4–*5 (Jan. 12, 2017) ("We find that the agency failed to produce agency report that coherently addressed the agency's rationale for the cancellation of the solicitation."); *Pro-Fab, Inc.*, B-243607, 91-2 CPD ¶ 128, 1991 WL 162538, *3 (Aug. 5, 1991) ("The agency's speculation that increased competition or cost savings will result from [the cancellation and] solicitation of the identical requirements is not supported by the record[.]").

In sum, this Court concludes that although it is not irrational *per se* for an agency to prefer one contractual vehicle over another or even for the TMS MAIDIQ to be more suitable for the Army's needs in this case, the government here did not provide a sufficiently documented rationale or meaningful analysis for cancelling the original 13F and JFOC Solicitations for the purpose of transitioning the work to the TMS MAIDIQ.

## B.   The Agency's Cancellation Decision Violates The Law

Plaintiffs argue that the TMS MAIDIQ cannot be leveraged for the work at issue because doing so would violate the Rule of Two.  As explained *supra*, see Section II.B., whether we view Plaintiffs' argument as merely addressing the rationality of the cancellation decision or whether we view the agency's cancellation as representing an independent decision with respect to its putative set-aside obligations (as the government appears to do), the result is the same: the central rationale for the agency's cancellation of the solicitations at issue depends upon whether the agency may leverage the TMS MAIDIQ to meet the agency's needs.  In either case, the Court agrees with Plaintiffs that the agency's failure to conduct a Rule of Two analysis vitiates the cancellation decision.

### 1.   The Agency Improperly Failed To Comply With The Rule Of Two, Which Applies To The Work At Issue

The Rule of Two – as the Court already has explained – is straightforward, and provides that "[t]he contracting officer **shall** set aside **any acquisition** over the simplified acquisition threshold for small business participation when there is a reasonable expectation that – (1) Offers will be obtained from **at least two responsible small business concerns**; and (2) Award will be made at fair market prices."  FAR 19.502-2(b) ("Total small business set-asides") (emphasis added).  The government's

decision to procure the services at issue is itself part of an acquisition[54] – the cancelled solicitations constitute part of that acquisition – and the agency's continued decision to procure those services is part of an acquisition (whether viewed as a continuation of the same acquisition, under a newly proposed strategy, or whether viewed as an entirely new acquisition).[55]  Nor does the government dispute that, in light of the acquisition history thus far, there are at least two responsible business concerns capable of performing the work at fair market prices,[56] or that, in general, the Rule of Two is mandatory.  *Mgmt. & Training Corp. v. United States*, 115 Fed. Cl. 26, 44 n.13 (2014) ("this

---

[54] FAR 2.101 ("Acquisition begins at the point when agency needs are established").

[55] Although the Court hesitates to further belabor the jurisdictional question, the Federal Circuit's decision in *Distributed Solutions* is worth another brief discussion here.  In that case, this Court had granted the government's motion to dismiss, but the Federal Circuit reversed, concluding that two agencies had "initiated 'the process for determining a need,'" *Distributed Solutions*, 539 F.3d at 1346, in that an RFI "was a market survey to gather data to determine an acquisition strategy, and the beginning of a procurement process, within the procurement protest jurisdiction granted to the Court of Federal Claims by the Tucker Act."  *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 375 (2012) (on remand).  The Federal Circuit reasoned that the plaintiffs in that case, "as potential competitors under a direct procurement," *id.*, with the government – an acquisition strategy the agencies sought to avoid – were objecting to "alleged violation[s] of statute[s] or regulation[s] *in connection with a procurement or a proposed procurement*."  28 U.S.C. § 1491(b)(1) (emphasis added).  The Federal Circuit previously had concluded that the phrase "'in connection with a procurement or a proposed procurement'" is "'very sweeping in scope.'"  539 F.3d at 1345 (quoting *RAMCOR*, 185 F.3d at 1289).  Because a "procurement includes all stages of the process of acquiring property or services, *beginning with the process of determining a need* for property or services and ending with contract completion and closeout," *id.* (emphasis in original) (internal quotation marks omitted), the Federal Circuit concluded that "plaintiffs' grievances [regarding the RFI and planned acquisition strategy] fell in that continuum."  104 Fed. Cl. at 375; *see* 41 U.S.C. § 111 (defining "procurement").  Accordingly, "[w]hile the government ultimately decided not to procure software itself from the vendors, but rather to add that work to [an] existing contract …, the statute does not require an actual procurement."  539 F.3d at 1346.  Instead, "[t]he statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'"  *Id.*  Summarized, "[p]laintiffs possessed jurisdictional standing because they: (1) were prospective bidders; (2) had a direct and significant economic interest in the proposed direct procurement that was eliminated; and (3) alleged a number of statutory and regulatory violations in the decision to forego a direct procurement."  104 Fed. Cl. at 375.  Plaintiffs in this case are similarly situated to those in *Distributed Solutions*, and the central allegations here are similar to those at issue in that case, as well.

[56] PTP Resp. at 9 ("The Agency does not dispute that multiple small businesses (SDVOSBs) stand ready and willing to submit offers to perform the 13F and JFOC requirements at fair market prices.").

court has consistently held that the Rule of Two is mandatory" (citing cases)); *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378, 411 (2017).[57]

Notably, in *Analytical Graphics*, the government argued at length that while "[t]here are many competition statutes and regulations, . . . they are structured in such a way to give priority to the application of the small business set-aside[,]" and thus "[o]ther competition regulations may be applied to the subsequent competition between small businesses." Defendant's Cross-Motion for Judgment on the Administrative Record, 2017 WL 2722839 (March 7, 2017) (*filed in* Case No. 116CV01453, *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378 (2017)). Indeed, the government in that case argued that "[t]he expedited procedures associated with a Rule of Two determination further confirm the intention to make the set-aside determination at the very start of procurement decision-making." *Id.* (explaining that "the mandatory term 'shall' . . . requires the Government to set-aside acquisitions when the Rule of Two is satisfied" and noting that Supreme Court's decision in *Kingdomware Technologies*, 136 S. Ct. at 1976–77 (interpreting the term "shall" in the context of a different small business preference)).[58]

This Court agrees with the government's position in *Analytical Graphics*, and the government does not really make an effort to contend otherwise here. Rather the government argues only that "the 2010 statutory and regulatory changes . . . are fatal to [Plaintiffs'] attempt to challenge the ability to issue task orders under the TMS MAIDIQ."[59] Def. MJAR at 26. According to the government, pursuant to those changes

---

[57] In *Analytical Graphics,* 135 Fed. Cl. at 411, the Court quoted *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 680 (2016) (quoting 48 C.F.R. § 19.501(c)): "As noted by another Judge of the United States Court of Federal Claims, '[C]ontracting officers are required to 'review acquisitions to determine if they can be set aside for small business,' and must 'perform market research' before concluding that an acquisition should not be set aside for a small business.'" *See* FAR 19.203(e) ("Small business set-asides have priority over acquisitions using full and open competition.").

[58] In *Kingdomware*, the Supreme Court addressed a similar Rule of Two contained in The Veterans Benefits, Health Care, and Information Technology Act of 2006, requiring the Secretary of Veterans Affairs to set annual goals for contracting with service-disabled and other veteran-owned small businesses. 38 U.S.C. § 8127. In finalizing the regulations to implement the Act, the Department indicated in a preamble that § 8127's procedures "do not apply to [Federal Supply Schedule] task or delivery orders." *VA Acquisition Regulation*, 74 Fed. Reg. 64624 (Dec. 8, 2009) (quoted in *Kingdomware*, 136 S. Ct. at 1974). Nevertheless, because of the mandatory nature of the statute, the Court rejected the government's argument that "the mandatory provision does not apply to 'orders' under 'pre-existing FSS contracts.'" 136 S. Ct. at 1978 (quoting the government's brief).

[59] The government also challenges our jurisdiction to decide any Rule of Two issue here, *see* Def. MJAR at 26, but the Court rejected that argument, *supra*, *see* Section II.B.

"as implemented in the FAR and the Small Business Act, contracting officers have the discretion to make use of a multi-award contract without first conducting a rule of two analysis to determine whether the task order should be set aside for small business." *Id.* at 28; *see id.* at 26–30 (relying upon 15 U.S.C. § 644(r), FAR 19.502-4, and FAR 16.505(b)(2)(i)(F)).

The Court rejects the government's interpretation of the provisions upon which it relies. First, as PTP correctly notes, "[t]he Rule of Two unambiguously applies to 'any' 'acquisition,' FAR 19.502-2, without any loophole for MAIDIQ task orders. . . ." PTP Resp. at 9. Second, the government misreads the statutory and FAR provisions.

We begin, once again, with the statutory language. Section 644(r) of Tile 15 of the United States Code mandates the issuance of regulations to provide agencies "at their discretion" to take several actions. The government focuses on the word "discretion," but then conspicuously only summarizes the remaining statutory language. Def. MJAR at 26–27 (ECF No. 30 at 30–31). The actual statutory words, however, demonstrate the government's summary is wrong; we must be precise about what "discretion" agencies gained. Pursuant to 15 U.S.C. § 644(r), agencies may:

> (1) set aside part or parts of a multiple award contract for small business concerns . . . ;
>
> (2) notwithstanding the fair opportunity requirements under section 2304c(b) of title 10 and section 4106(c) of title 41, set aside orders placed against multiple award contracts for small business concerns. . .; and
>
> (3) reserve 1 or more contract awards for small business concerns under full and open multiple award procurements . . . .

15 U.S.C. § 644(r)(1) – (3). This language is straightforward. The first subparagraph means that an agency, when awarding a multiple award contract, may designate particular portions of the scope of work to be performed only by small business. The second paragraph means that even though, normally, every multiple award contract holder must be permitted – pursuant to "fair opportunity requirements" – to compete for every task order, agencies may set aside particular task orders for which only small business multiple award contract holders may compete. And the final paragraph means that, of the multiple awards to be made in a multiple award contract procurement, some contact award slots may be set aside for small business concerns, even though the overall procurement is generally full and open. FAR 19.502-4 supports our reading given that it covers "Partial set-asides of multiple-award contracts" and

specifically provides that "contracting officers may, at their discretion, set aside a portion or portions of a multiple-award contract" under certain circumstances.[60]

Accordingly, that statute only tells an agency *how* a multiple award contract may be structured or *how* a task order competition under a multiple award contract may be competed.  In contrast, none of those provisions answers the question, one way or the other, of whether an agency – when deciding the foundational, prerequisite question of what type of procurement vehicle to use for a planned acquisition (*i.e.*, to satisfy a particular agency need) – may avoid the Rule of Two merely because a MAIDIQ already has been awarded and the agency prefers to use that vehicle.  Again, the fact that an agency has the discretion to partially set-aside "a portion" of a multiple award contract for small business does not lead to the ineluctable conclusion that having decided *not* to engage in a partial set-aside, an agency may thereafter dispense with the Rule of Two.  The latter does not follow from the former.  To the contrary, the grant of discretion applies even where the Rule of Two does *not* require a set-aside, but the grant of discretion does not somehow, by negative implication, eliminate the Rule of Two requirement.

In sum, what the government really seems to be arguing is that the agency, having awarded its preferred TMS MAIDIQ without any set-aside component, is now exempt from applying the Rule of Two to any proposed procurement (or acquisition) of services that might be obtained using the TMS MAIDIQ.  Put yet differently, the government asserts that, having exercised its discretion *not* to set-aside *any* portion of the TMS MAIDIQ scope or *any* of the TMS MAIDIQ's contract awards for small business, the agency can utilize the TMS MAIDIQ for any acquisition – and avoid the

---

[60] Further support for this understanding can be found in a Proposed Rule notice issued by the SBA:

> [T]he Jobs Act amended the Small Business Act (Act) to permit Federal agencies to:
>
> • Set-aside part or parts of multiple award contracts for small business concerns . . . ;
>
> • Set-aside orders placed against multiple award contract (notwithstanding the fair opportunity requirements set forth in 10 U.S.C. 2304c and 41 U.S.C. 253j) for small business concerns . . .; and
>
> • Reserve one or more contract awards for small business concerns under full and open competition, where the agency intends to make multiple awards . . . .

*Acquisition Process: Task and Delivery Order Contracts, Bundling, Consolidation*, 77 Fed. Reg. 29130-01 (May 16, 2012).

Rule of Two – so long as the contemplated scope of work is within the TMS MAIDIQ's scope.  No statutory or regulatory language, however, supports such a sweeping inference.

PTP, for its part, argues that "19.502-4 plainly does not relieve agencies from applying the Rule of Two, as the first of five conditions stated in FAR 19.502-4 is that: 'Market research indicates that a total set-aside is not appropriate [pursuant to the Rule of Two].'"  PTP Resp. at 10 (quoting FAR 19.502-4(1).  In that regard, PTP asserts that, pursuant to that subparagraph's "plain language, the <u>discretion to set aside</u> **orders** described does not apply unless the Agency has first engaged in market research and confirmed that the Rule of Two does not <u>mandate total set aside</u>."  PTP Resp. at 11 (underline in original, bold text added).  On that point, however, the Court parts ways with PTP, as well.  Although PTP reads FAR 19.502-4(1) as applying to "orders," the regulation – as demonstrated above – only addresses how and when an agency may "set aside a portion or portions of a multiple-award contract."  Thus, all FAR 19.502-4(1) provides is that, with respect to a scope of work, the agency cannot create a multiple award contract with only a partial set aside "portion" where that overall scope of work should be entirely set-aside (*i.e.*, at "total set-aside") pursuant to the Rule of Two.  Again, however, that does not answer the question of whether the agency has any obligation to apply the Rule of Two to a particular scope of work that is covered by the scope of an already-issued multiple-award contract.[61]

Nor does FAR 16.505(b)(2)(i)(F) advance the interpretive ball.  That provision is simply one of many "[e]xceptions to the fair opportunity process" under an IDIQ contract.  FAR 16.505(b)(2).  In the absence of an applicable exception, "[t]he contracting officer shall give every *awardee* a fair opportunity to be considered for a delivery-order or task-order exceeding $3,500…."  FAR 16.505(b)(2)(i) (emphasis added).  In other words, "contracting officers may, at their discretion, set aside orders" under an IDIQ without violating the fair opportunity to compete requirement that normally applies.  FAR 16.505(b)(2)(i)(F).  But that, too, tells us nothing about whether a procuring agency

---

[61] FAR 19.504 covers "Orders under multiple-award contracts" but also does not deal with this case.  Rather, FAR 19.504 presumes a multiple-award contract for which a partial set-aside of scope has been made already, or where small businesses hold an unrestricted contract slot.  *See* FAR 19.504(a)(1) ("The contracting officer shall state in the solicitation and resulting contract whether order set-asides will be discretionary or mandatory when the conditions in 19.502-2 are met at the time of order set-aside. . . ."); *see also* FAR 19.504(b) ("Orders under partial set-aside contracts.").  If, under a particular multiple award contract, there is no small business contractor, the agency cannot set aside a task order.  *See* PTP Resp. at 11 ("discretionary authority 'obviously works only if there are small business awardees on the multiple award contract'" (quoting 78 Fed. Reg. 61123 (Oct. 2, 2013))).

must apply the Rule of Two to a scope of work *before* deciding whether to leverage an existing multiple award contract.

In sum, none of the updates to the various small business set-aside provisions resolve the question before this Court: whether the agency must apply the Rule of Two to a discrete scope of work *before* deciding to use an existing MAIDIQ. This Court answers that question in the affirmative, once again following the same reasoning as the GAO in *LBM, Inc.* In that case, LBM, Inc., a small business concern, protested the Army's decision to acquire transportation motor pool services under the LOGJAMSS contracts. *LBM, Inc.*, B-290682 at *1. The GAO found that the "Army violated FAR § 19.502-2(b) when the agency did not consider continuing to acquire the Fort Polk motor pool services under a total small business set-aside, and . . . sustain[ed] LBM's protest on this basis."). *Id.* at *8. The GAO reasoned as follows:

> Acquisition is defined by the FAR to mean:
>
>> the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated. Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.
>
> FAR § 2.101. Under this broad definition, the agency's purchasing the Fort Polk motor pool services by contract with appropriated funds is an "acquisition," subject to FAR § 19.502-2(b), regardless of the fact that the agency anticipated acquiring those services through their transfer to the LOGJAMSS scope of work. . . . Had the agency complied with the requirements of FAR § 19.502-2(b), it might have concluded that the LOGJAMSS contracts were not the appropriate vehicle for this acquisition. Whatever the

> outcome of the FAR § 19.502-2(b) analysis, though, the
> agency's intent to use a task order under LOGJAMSS as the
> contract vehicle did not eliminate the legal requirement that
> the agency undertake that analysis.

*Id.* at *7. Notably, the GAO reached that conclusion notwithstanding that there were "four small business concerns that [held] LOGJAMSS contracts." *Id.* at *8 n.7. Indeed, the agency thereafter asked the GAO to modify its recommendation so that the agency could compete the work at issue amongst only the small business LOGJAMSS contractors. The GAO rejected the agency's request, explaining:

> The Army apparently now concedes that under FAR § 19.502-
> 2(b) these services should be set aside for exclusive small
> business competition. As discussed above, any such
> competition must be a full and open competition among the
> eligible small businesses; there is no legal authority in such
> circumstances to limit this competition to certain designated
> small businesses.

*Dep't of the Army--Request for Modification of Recommendation*, B-290682.2, 2003 CPD ¶ 23, 2003 WL 103408, *5–*6 (Jan. 9, 2003) ("[W]hat the Army has requested is not consistent with the statutory and regulatory scheme applicable to small business set-asides. The Army is essentially asking us to waive statutory requirements for what the Army views as strong policy reasons.").[62]

The bottom line from this Court's perspective is that the cancelled solicitations at issue here are themselves acquisitions. The government's identification of a need – of a scope of work – that it must procure itself begins an acquisition. Accordingly, we view

---

[62] Although the GAO "agreed to hear LBM's contention despite the (then in-place) limitation on [GAO's] jurisdiction to hear protests involving the placement of task and delivery orders" it did so because the GAO "treated LBM's complaint as a timely solicitation challenge to the LOGJAMSS contract." *Delex Sys., Inc.*, B-400403, 2008 CPD ¶ 181, 2008 WL 4570635, *7 (Oct. 8, 2008). (discussing *LBM,* at *5–*6). In contrast, we view jurisdiction as proper in this case either as a challenge to the cancellation of a solicitation or as a violation of the Rule of Two; either way, this Court properly considers Plaintiffs' claims under the last prong of 28 U.S.C. § 1491, as explained *supra, see* Section II, and not as a challenge to the TMS MAIDIQ. Even if we were to consider Plaintiffs' claims as a challenge to the TMS MAIDIQ, however, we would follow *LBM*'s approach to the task order protest bar, and not apply it here. *LBM*, at *3 ("Contrary to the Army's arguments, LBM is not challenging the proposed issuance of a task order for these services, but is raising the question of whether work that had been previously set aside exclusively for small businesses could be transferred to LOGJAMSS, without regard to the Federal Acquisition Regulation (FAR) § 19.502-2(b) requirements pertaining to small business set-asides.").

the identification of the continued need for 13F and JFOC requirements as either part of
in-process acquisition or a new acquisition.  Either way – no matter how the acquisition
is viewed – PTP is correct that the "Rule of Two unambiguously applies" to "any
acquisition," FAR 19.502-2, "and just because the Agency may have satisfied its small
business set aside obligations with respect to the TMS MAIDIQ acquisition in 2018 does
not mean the Agency has also satisfied its set aside obligations with respect to the
separate acquisitions of the 13F and JFOC requirements in 2020."  PTP Resp. at 12.
Nothing in the updated small-business regulations provides otherwise.[63]

Moreover, where the FAR intends to make the Rule of Two entirely inapplicable
to the selection of a particular procurement vehicle, the FAR knows how to do so.  *See*
FAR 8.404(a) ("Use of Federal Supply Schedules") (providing that FAR "Parts 13
(except 13.303-2(c)(3)), 14, 15, and 19 (except for the requirements at 19.102(b)(3) and
19.202-1(e)(1)(iii)) do not apply to BPAs or orders placed against Federal Supply
Schedules contracts (but see 8.405-5)").  Accordingly, there is no requirement for an
agency to apply the Rule of Two *prior* to an agency's electing to use a FAR Part 8 FSS
procurement, although the agency has the discretion to set-aside such procurements
after deciding to utilize FAR Part 8, just as the Army did here with respect to the 13F
and JFOC Solicitations.  *See* FAR 8.405-5(a) ("Although the preference programs of part
19 are not mandatory in this subpart, in accordance with section 1331 of Public Law
111-240 (15 U.S.C. 644(r)) - (1) Ordering activity contracting officers may, at their
discretion - (i) Set aside orders for any of the small business concerns identified in
19.000(a)(3)").

---

[63] Later GAO decisions are not to the contrary.  In *Delex Systems, Inc.*, B–400403, the GAO merely
"concluded that the set-aside provisions of FAR §19.502–2(b) applied to competitions for task
and delivery orders issued *under* multiple-award contracts" (emphasis added); and, in *Aldevra*,
the GAO explained that it had "subsequently found that [its] holding in *Delex* had been
superseded by the passage of section 1331 of the Jobs Act."  *Aldevra*, B–411752, 2015 CPD ¶ 339,
2015 WL 6723876 n.4 (Oct. 16, 2015) (citing *Edmond Scientific Co.*, B–410179, 2014 CPD ¶336, 2014
WL 6199127, *8 n.10 (Nov. 12, 2014)).  None of those decisions address the precise question at
issue in this case.  For example, in *Edmond*, the protestor simply "allege[d] that the agency was
required to use the Rule of Two to decide whether to set aside [a] task order" – that is, "whether
the Army abused its discretion in not reserving this task order for small business participation"
*under* a particular multiple award contract.  2014 WL 6199127, *3, *5.  The GAO reached the
same conclusion this Court did, above: the applicable FAR provisions "grant discretion to a
contracting officer about whether to set aside for small business participation task orders placed
under multiple-award contract."  *Id.* *5 (discussing FAR §§19.502–4, 16.505(b)(2)(i)(F)).  In short,
none of those GAO cases, except *LBM*, addresses the precise issue of an agency moving work
currently performed by a small business to a MAIDIQ where the incumbents are ineligible to
compete for an award.

In contrast, no provision similar to FAR 8.404(a) – exempting the selection of an FSS procurement from FAR Part 19 – exists in FAR part 16, generally, or FAR 16.5, in particular.[64]

To the extent the agency argues that Plaintiffs' claims with regard to the Rule of Two are nothing more than untimely challenges to the TMS MAIDIQ solicitation, the Court rejects that contention. The Court, instead, once again, agrees with PTP: "Had [Plaintiffs] protested the TMS MAIDIQ Solicitation on the basis that the Agency might one day issue task orders for 13F and JFOC work (not even specified in the TMS MAIDIQ), the Agency would have challenged the action as unripe (speculative as to whether the task orders would issue and whether the MAIDIQ would include small business contractors)." PTP Resp. at 14; *see also LBM*, B-290682 at *3–*5 (rejecting solicitation protest timeliness argument). Given that there is no evidence that the incumbent Plaintiffs had reason to believe that the work would be consolidated into the TMS MAIDIQ *at the time the TMS MAIDIQ solicitation was issued*, the Court will not apply waiver. *Cf. Boeing Co. v. United States*, 968 F.3d 1371, 1382 (Fed. Cir. 2020).

In sum, the government's failure to apply the Rule of Two prior to deciding to cancel the solicitations at issue is fatal to that decision, whether because that failure undermines the central rationale of the cancellation decision or whether because the decision to move the work to the TMS MAIDIQ prior to conducting a Rule of Two analysis constitutes an independent violation of law.

## 2. Additional Violations Of Law

The Court further concludes that the agency violated FAR 19.502-9 ("Withdrawing or modifying small business set-asides"). That provision permits a contracting officer to "withdraw [a] small business set-aside" only where "before award of a contract involving a total or partial small business set-aside, the contracting officer

---

[64] If FAR Subpart 16.5 contained a provision similar to FAR 8.404(a), perhaps this Court would reach a different conclusion. *See* FAR 16.000 ("This part describes types of contracts that may be used in acquisitions. It prescribes policies and procedures and provides guidance for selecting a contract type appropriate to the circumstances of the acquisition."); FAR 16.5 ("Indefinite-Delivery Contracts"). Indeed, FAR 16.500(e) instructs its readers to "[s]ee subpart 19.5 for procedures [1] to set aside part or parts of multiple-award contracts for small businesses; [2] to reserve one or more awards for small business on multiple-award contracts; and [3] to set aside orders for small businesses under multiple-award contracts." Notably, this Court interpreted the various provisions discussed above (*e.g.*, 15 U.S.C. § 644(r), FAR 19.502-4, FAR 19.504, and FAR 16.505(b)(2)(i)(F)) as governing precisely the actions specified in FAR 16.500(e). None of those procedures, however, answer the preliminary, more basic question of whether the Rule of Two must be applied in an acquisition *before* deciding whether a particular MAIDIQ may be used at all.

considers that award would be detrimental to the public interest (e.g., payment of more than a fair market price)[.]"  FAR 19.502-9.[65]  Where such a decision is made, "[t]he contracting officer *shall initiate a withdrawal* of an individual total or partial small business set-aside, *by giving written notice to the agency small business specialist and the SBA PCR* . . . stating the reasons." *Id.* (emphasis added).[66]  The Court holds that the agency's decision to cancel the solicitations at issue and move the scopes of work to the TMS MAIDIQ constitutes a withdrawal of a set-aside. *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 592 (2003); *Aviation Enterprises, Inc. v. United States*, 8 Cl. Ct. 1, 27 (1985) ("After the solicitation was cancelled and the Air Force opted to utilize aircraft under an existing lease, such actions can arguably be considered a withdrawal of the unilateral set-aside.").

This unexplained violation of law independently justifies judgment for Plaintiffs.[67]  Had the agency complied with the above-quoted FAR 19.502-9 and related procedures, the agency may not have cancelled the solicitations in favor of the TMS MAIDIQ.  *See, e.g.*, *Gear Wizzard, Inc. v. United States*, 99 Fed. Cl. 266, 275 (2011) (noting the government's explanation that "one of the reasons the contracting officer sought a new procurement was because of [the agency's] failure to properly withdraw the set-aside requirement in accordance with FAR 19.506[,]" the prior version of FAR 19.502-9); *id.* at 276 ("According to defendant, 'Based on these and other errors, the contracting officer determined it was necessary to start over with a new procurement.'").[68]

---

[65] Although this FAR provision applies "before award of a contract," the Court finds it applicable, as the solicitation cancellations were, in fact, "before award of a contract."  Since the agency had cancelled the contracts, the 13F and JFOC Solicitations were pending at the time of cancellation, the agency was in receipt of responsive proposals, and the agency could have made a new award as part of its corrective action.  The fact that one set of awards had been made and canceled does not make this FAR requirement in applicable.  In any event, the agency cannot be permitted to evade FAR 19.502-9 merely by awarding a contract, cancelling it, and then cancelling the solicitation.

[66] SBA PCR is short for Small Business Administration Procurement Center Representatives, "who are generally located at Federal agencies and buying activities which have major contracting programs" and "may review any acquisition to determine whether a set aside or sole-source award to a small business under one of SBA's program is appropriate."  13 C.F.R. § 125.2; *see* FAR 19.402.

[67] The government does not address this issue at all in its briefs.  Any further response is therefore waived.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("'When a party includes no developed argumentation on a point . . . we treat the argument as waived under our sell established rule.'" (quoting *Anderson v. City of Boston*, 375 F.3d 71, 91 (1st Cir. 2004))).

[68] In *Aviation Enterprises, Inc.*, the plaintiff asserted that the government "failed to comply with the notice provisions of section 19.506[,]" the predecessor provision to FAR 19.502-9.  8 Cl. Ct. at

The Court also concludes that the agency violated 10 U.S.C. § 2305(b)(2), which provides that "competitive proposals received in response to a solicitation may be rejected if the head of the agency determines that such action is in the public interest." Based on the Administrative Record, the Court was unable to find the involvement of the agency head in a cancellation decision, any delegation of authority by the head of agency to the contracting officer to make a cancellation decision, or that the contracting officer is delegated such authority under the applicable regulations governing a FAR Part 8 procurement seeking competitive proposals pursuant to an RFP.  *See AFARS* Appendix GG (Delegations).  Moreover, nowhere does the agency conclude that the cancellation of the 13F and JFOC Solicitations is in the "public interest."[69]

## V.    The Court Grants Plaintiffs' Request For Injunctive Relief

The Tucker Act vests this Court to award "any relief that the court considers proper, including . . . injunctive relief."  28 U.S.C. § 1491(b)(2); *see* RCFC 65.  In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest.  *PGBA v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *see Kiewit Infrastructure West Co.*, 147 Fed. Cl. at 712 (applying these four factors to an agency cancellation decision).

As this Court explained at length above, Plaintiffs have succeeded on the merits.

---

29.  Although just as here, "[i]t [was] uncontradicted that neither the contracting officer nor any [ ] procuring official ever notified a SBA representative of the decision to utilize existing" leases. *Id.*  The Claims Court concluded that "[t]hough this failure to give notice may have been a minor technical violation of the regulation, assuming the regulation to be applicable, the court finds that such a minor violation does not warrant injunctive relief" because "[n]ot every violation of a regulation mandates a right to relief."  *Id.* (citing *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 573–74, 492 F.2d 1200, 1203–4 (Ct. Cl. 1974)).  The undersigned respectively disagrees with *Aviation Enterprises*, particularly given its reliance on a pre-ADRA case.  *See Impresa Construzioni*, 238 F.3d at 1333 ("cases such as *Keco* . . . are based on the implied contract theory of recovery and do not govern APA review of contracting officer decisions").

[69] The closest that the agency comes to making such a conclusion is CO Abraham's assertion that "the ***Government's best interest can be met*** by competing the JFO, 13F and KMS requirements under the MICC-Fort Eustis recently awarded TMS MAIDIQ."  ECF No. 25 at 620 (AR 616) (emphasis added).  That the TMS MAIDIQ "*can meet*" the "government's" "best interest" may simply mean that the TMS MAIDIQ is one option to meet the agency's needs, and, in any event, is not the same as a determination that a solicitation cancellation *is* in the *public*'s interest.

In evaluating irreparable harm, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993). Moreover, in the bid protest context, "the loss of the opportunity to fairly compete for future government contracts constitutes irreparable harm." *ViroMed Laboratories, Inc. v. United States*, 87 Fed. Cl. 493, 503 (2009). Here, with regard to TTGI, the agency cancelled TTGI's 13F contract award and then, instead of reevaluating proposals or re-soliciting the requirement with an amended solicitation, the agency cancelled the 13F Solicitation for the purpose of moving the work to the MAIDIQ, under which TTGI is not a contract holder and therefore is ineligible to bid on any task order procurement. TTGI's loss of anticipated profits from the 13F contract award, in addition to its inability to compete for that work on the MAIDIQ, establishes the immediate and irreparable harm that TTGI would suffer in the absence of an injunction. Turning to PTP, following the agency's cancellation of the 13F and JFOC contract awards, PTP, the prior incumbent on both contracts – having successfully induced corrective action following GAO protests – once again stood to have an opportunity to have its proposal considered for award or to submit a proposal on an amended solicitation. Instead, PTP's protests resulted in its losing the opportunity to compete. While PTP's harm is arguably more speculative than that of TTGI (insofar as PTP had not been awarded the now-cancelled contracts and solicitations), nonetheless, "it is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury." *MORI Assoc., Inc.*, 102 Fed. Cl. at 553. As PTP also is not a contract holder on the TMS MAIDIQ, PTP faces similar irreparable harm should the procurement be solicited on the TMS MAIDIQ without the agency first conducting a Rule of Two analysis, the results of which may permit PTP to bid on the work at issue. For these reasons, this Court finds Plaintiffs meet the second factor for equitable relief.

In balancing the harms, the agency has not shown that the continued use of the GSA MAS contracts will be onerous. While the government asserts that "the primary harm to the Government" is its inability to "finally use a long-planned IDIQ designed for these requirements, and to leave behind the ill-fitting stop-gaps of the GSA MAS task orders, as it always intended to do," Def. MJAR at 36, this Court, as discussed above, is unable ascertain the factual basis for the agency's decision that the GSA MAS contracts were "ill-fitting" and, as such, cannot conclude that the harm to the government would outweigh the clear harm to Plaintiffs. The government's further contention that "delay will also harm the FCoE, as it threatens to leave it with an inability to secure the necessary training for artillery personnel," *id.*, suffers from the same defect. In addition, crediting the government's assertion here would be tantamount to punishing PTP, in particular, for having filed a GAO protest, the effect of which was to secure corrective action. The agency should not be permitted to conduct a

procurement, inducing would-be contractors to expend time and money preparing and submitting proposals, only to have the rug pulled out from underneath them when an offeror points out putative flaws in the agency's process.  This is not a case where the agency has shown that its substantive needs have changed, and a different vehicle is more capable of meeting those changed needs.  Moreover, the Court's decision here does not even preclude the agency from proceeding, *per se*, with an alternative procurement vehicle that better meets the agency's needs.  Rather, the injunctive relief ordered here merely reinstates the status quo prior to the cancellation decisions and requires the agency to follow the law consistent with this decision.

The public interest also favors this Court's granting an injunction, as "the public always has an interest in the integrity of the federal procurement system."  *Starry Assoc.*, 127 Fed. Cl. at 550 (citing *Hosp. Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system.").  This is particularly applicable to the present case where the agency's cancellation and planned movement of work to the TMS MAIDIQ violated statutory and regulatory requirements.

*CONCLUSION*

The Court **GRANTS** Plaintiffs' respective motions for judgment on the Administrative Record and **DENIES** the government's cross-motion for judgment.  The Court further **GRANTS** Plaintiffs' request for equitable relief and orders as follows:

1. To the extent formal cancellations of Solicitation Nos. W9124L-20-R-0016 and W9124L-20-R-0020 have not been issued already, the agency is enjoined from cancelling them in the absence of a new cancellation decision.

2. To the extent the agency already has cancelled those solicitations, the cancellation decisions hereby are set-aside as unlawful, and the agency is instructed to reinstate the solicitations.

3. The agency is enjoined from transitioning the 13F and JFOC requirements to the TMS MAIDIQ (or any other procurement vehicle) without complying, at a minimum, with FAR 19.502-2, FAR 19.502-9, and 10 U.S.C. § 2305(b)(2).

4. Should the agency determine, however, that a change in acquisition vehicle is still warranted, the agency shall issue new cancellation decisions not inconsistent with this opinion and order.

If Plaintiffs believe they are also entitled to proposal preparation costs under the facts of this case, *see, e.g.,* TTGI Am. Compl. at 11 (¶ F), they shall file a motion for such on or before December 14, 2020. *See CNA Corp. v. United States*, 83 Fed. Cl. 1, 8–12 (2008), *aff'd*, 332 Fed. Appx. 638 (Fed. Cir. 2009).

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge